JOSEPH E. PROCTOR and SHIRLEY I. PROCTOR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Proctor v. Commissioner
Docket Nos. 11063-78, 11064-78, 11065-78.
United States Tax Court
T.C. Memo 1981-436; 1981 Tax Ct. Memo LEXIS 307; 42 T.C.M. (CCH) 725; T.C.M. (RIA) 81436; August 17, 1981. *307 Petitioners Joseph and Shirley Proctor owned all of the stock in petitioner Chattanooga Products while Joseph Proctor (Proctor) individually owned all of the stock in petitioner R & D. 1. Held, the Proctors failed to prove that unexplained bank deposits in 1972, 1973 and 1976 did not represent unreported income as determined by respondent. 2. Held, charitable contribution deductions under sec. 170(a)(1), I.R.C. 1954, for the Proctors' 1972, 1973 and 1976 tax years determined. 3. Held, payments by Proctor to Chattanooga Products and R & D during 1976 constituted interest deductible under sec. 163(a), I.R.C. 1954. 4. Held, Proctor did not realize taxable income by reason of interest-free loans to him by Chattanooga Products. Dean v. Commissioner, 35 T.C. 1083 (1961), followed. 5(a). In 1973, Chattanooga Products gave a Corvette to a customer's employee because he was responsible for that customer entering into a long-term lease with Jepco, Proctor's wholly-owned corporation. Held, Proctor constructively received a dividend from Chattanooga Products in 1973 equal to the cost of the Corvette ($ 6,156) because of the economic benefit which inured to Proctor by virtue of his *308 100-percent ownership of Jepco. 5(b). In 1972 and 1973, Chattanooga Products paid medical insurance premiums for the benefit of Mrs. Proctor's brother. Held, the amounts of premium payments were dividends to be included in income by the Proctors in each of those years. 6. Chattanooga Products allowed each of the Proctors to use an automobile for business and personal use. Chattanooga Products owned the automobiles and paid the expenses associated with their operation. Held, the portion of expenses determined to be associated with the business use of such automobiles by the Proctors was deductible by the corporation. Held further, each of the Proctors received dividends equal to the fair value of the benefit received as a result of their personal use of the automobiles. 7. During its fiscal years ended April 30, 1972, April 30, 1973, April 30, 1974 and April 30, 1976, Chattanooga Products made payments to Mrs. Proctor's mother, who performed services for the corporation. Held, the amount of reasonable compensation for the services performed by Mrs. Proctor's mother determined. Held further, such reasonable compensation was deductible by the corporation under sec. 162(a), I.R.C. 1954. *309 Held further, the Proctors constructively received dividends equal to the amount paid to Mrs. Proctor's mother in excess of reasonable compensation, as determined. 8. Held, Chattanooga Products was not liable for the accumulated earnings tax under sec. 531, I.R.C. 1954, for its fiscal years ended April 30, 1972 and April 30, 1973 because its earnings and profits were accumulated for the reasonable needs of its business. Held further, in its fiscal year ended April 30, 1974, Chattanooga Products (1) accumulated earnings and profits beyond its reasonable business needs, (2) was availed of for the purpose of avoiding income tax with respect to its shareholders, and therefore (3) was liable for the accumulated earnings tax under sec. 531, I.R.C. 1954. 9. R & D sold spray washer equipment to its customers, pursuant to conditional installment sales contracts, in its fiscal year ended April 30, 1975. Held, R & D was not entitled to depreciation deductions claimed on such sold equipment in its fiscal years ended April 30, 1975, April 30, 1976 and April 30, 1977. Held further, R & D was not entitled to an investment tax credit under sec. 38, I.R.C. 1954, as reported on its April 30, *310 1975 tax return in connection with this sold equipment. 10. R & D acquired a spray washer business in its fiscal year ended April 30, 1975. Held, R & D failed to prove the impropriety of respondent's allocation of the purchase price between tangible and intangible assets and therefore respondent's allocation is sustained. 11. Held, for each of the years in issue, the petitioners are liable for additions to tax under sec. 6653(a), I.R.C. 1954. William L. Taylor, Robert G. Russell, and Barry L. Hoffman, for the petitioners. Isham B. Bradley, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Addition to tax
Docket No.
Petitioner
Tax Year Ended
Deficiency
under sec. 6653(a)
11063-78
Joseph E. Proctor
Dec. 31, 1972
$ 29,827.19
$ 1,491.35
and Shirley I.
Dec. 31, 1973
45,349.24
2,267.46
Proctor
Dec. 31, 1976
[2] *311 33,443.45
1,672.17
11064-78
Chattanooga
Apr. 30, 1972
34,104.74
1,705.24
Products Co.,
Apr. 308 1973
62,097.03
3,104.85
Inc.
Apr. 30, 1974
76,620.25
3,831.01
11065-78
R & D Products
Apr. 30, 1974
12,515.41
625.77
Corporation
Apr. 30, 1975
6,361.94
318.10
Apr. 30, 1976
3,345.53
167.28
Apr. 30, 1977
20,076.75
1,003.83
These cases have been consolidated for the purposes of trial, briefing and opinion. After concessions, [3] the issues for decision are: (1) whether for the years 1972, 1973 and 1976 petitioners Joseph E. Proctor (Proctor) and Shirley I. Proctor (together, Proctors) must report additional income as determined by respondent from unexplained deposits; (2) whether the Proctors are entitled to any charitable contribution deductions under section 170(a)(1), I.R.C. 1954, for the years 1972, 1973 and 1976; (3) whether Proctor is allowed interest expense deductions under section 163 for a portion of certain payments made by Proctor to Chattanooga Products Co., Inc. (Chattanooga Products) and R & D Products Corporation (R & D) in 1976; (4) whether Proctor realized income from the interest-free *312 use of funds borrowed from Chattanooga Products during the years 1972 and 1973; (5)(a) whether Proctor constructively received a dividend from Chattanooga Products for the year 1973 as a result of the corporation's transfer of a 1973 Corvette to David Bowie, and (b) whether the Proctors constructively received a dividend from Chattanooga Products for the years 1972 and 1973 because the corporation paid insurance premiums for the benefit of Mrs. Proctor's brother, Warren E. Cressman; (6) whether for the years ended April 30, 1972, April 30, 1973, April 30, 1974 and April 30, 1976, Chattanooga Products is entitled to automobile expense deductions under section 162 in connection with the use of corporate automobiles by the Proctors in excess of the amounts allowed by respondent, and to what extent each of the Proctors has received dividend income in the calendar years 1972 and 1973 due to their personal use of corporate automobiles; (7) whether Chattanooga Products may deduct under section 162 payments made to Mrs. Proctor's mother, Irene Cressman, during the corporation's fiscal years ended in 1973, 1974 and 1976, and whether the Proctors received constructive dividends during their *313 1972 and 1973 taxable years in connection with such payments; (5) whether Chattanooga Products is liable for the accumulated earnings tax under section 531 for the years ended April 30, 1972, April 30, 1973 and April 30, 1974; (9) whether R & D is entitled to depreciation deductions under section 167 for its 1975, 1976 and 1977 fiscal years and an investment tax credit under section 38 for its 1975 fiscal year on equipment subject to conditional sales contracts and, if not, the proper tax treatment to be afforded such equipment dealings; (10) whether in connection with its 1975 purchase of a spray washer business R & D has established that it is entitled to a different purchase price allocation than that determined by respondent; and (11) whether any of the petitioners herein are liable for additions to tax prescribed by section 6653(a) for negligence or intentional disregard of rules and regulations for the years under consideration. *314 FINDINGS OF FACT Some of the facts have been stipulated and are so found The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Joseph E. Proctor and Shirley I. Proctor, husband and wife, resided in Chattanooga, Tennessee at the time of the filing of the petitions herein. They filed joint individual income tax returns with the Internal Revenue Service Center in Memphis, Tennessee for the calendar years 1972, 1973 and 1976. Each return was filed utilizing the cash method of accounting. Chattanooga Products is a corporation organized in 1967 under the laws of the State of Tennessee with its principal place of business in Chattanooga, Tennessee. Chattanooga Products, an accrual method taxpayer, filed corporate income tax returns (Forms 1120) for the taxable years ended April 30, 1972, April 30, 1973, and April 30, 1974 and filed a small business corporation tax return (Form 1120S) for the taxable year ended April 30, 1976 with the Internal Revenue Service Center in Memphis, Tennessee. At all times material to these cases, Proctor owned 50 percent of Chattanooga Products' outstanding stock and Mrs. Proctor owned *315 the remaining 50 percent interest. At all times material to these cases, the Proctors were members of the board of directors and Proctor was president of Chattanooga Products. R & D is a corporation organized in 1968 under the laws of the State of Tennessee with its principal place of business in Chattanooga, Tennessee. For the taxable years ended April 30, 1972 and April 30, 1973, R & D filed small business corporation tax returns (Forms 1120S) with the Internal Revenue Service Center in Memphis, Tennessee. For the taxable years ended April 30, 1974, April 30, 1975, April 30, 1976, and April 30, 1977, R & D filed corporation income tax returns (Forms 1120) with the Internal Revenue Service Center in Memphis, Tennessee. R & D filed its returns on the accrual method of accounting. At all times material to these cases, R & D was wholly-owned by Proctor. During the years in issue, the business operations of Chattanooga Products and R & D, for the most part, consisted of retail and wholesale sales of industrial chemicals, industrial and commercial cleaning supplies and related products, commercial cleaning equipment and sanitary supplies, solvents, scouring and cleaning materials, *316 deodorants, disinfectants and insecticides. R & D was formed to market the products manufactured by Chattanooga Products in geographic areas outside of Chattanooga, Tennessee. During the years in issue, R & D acquired all of its salable products from Chattanooga Products. Jepco Warehousing, Inc. (Jepco) is a corporation that was organized under the laws of the State of Tennessee on September 25, 1973. Jepco was organized by Proctor for the purpose of building and operating warehouses to store glass containers for Chattanooga Glass Co. (Chattanooga Glass). Chattanooga Glass and the owners thereof are unrelated to the petitioners herein. However, a substantial portion of Chattanooga Products' sales were made to Chattanooga Glass. At all times material to these cases, Proctor owned 100 percent of the outstanding stock of Jepco. Fort-Lake Skating, Inc. (Fort-Lake) is a corporation that was formed to operate and manage a roller skating rink owned by Chattanooga Products. At all times material to these cases, Proctor owned 50 percent of the outstanding stock of Fort-Lake and an unrelated individual, Ken Gravit, owned the remaining 50-percent interest. Issue 1. *317 Unexplained Deposits
During the years in issue, the Proctors each received payroll and expense checks from Chattanooga Products and R & D. Generally, Mrs. Proctor either deposited the full amount of her payroll check into her own separate checking account or deposited a portion thereof and retained the remainder for personal needs. Proctor, on the other hand, was not so predictable. Proctor occasionally would deposit the full amount of his payroll check into one of his bank accounts. At other times he would deposit a portion of his check and retain the remainder. Still other times, he would cash and retain the full amount of his check. Generally, Proctor would cash his expense check and use the cash to pay his business expenses. Also, Proctor paid his personal expenses with cash. Proctor had a history of borrowing significant sums of money from Chattanooga Products and R & D. The following schedule shows the balance of Proctor's loan accounts with such corporations as of the close of the corporations' fiscal years indicated below: Fiscal year ended
April 30,
Chattanooga Products
R & D
1972
$ 42,699
1973
13,222
$ 11,420
1974
11,082
1975
42,109
23,903
1976
22,543
24,718 For the calendar years *318 1972, 1973 and 1976, the examining agent reviewed Proctor's personal bank accounts in an attempt to identify the sources of the various deposits to these accounts. Although Proctor was able to identify the sources of a majority of the deposits, there were a number of deposits for which sources could not be identified. Proctor was unable to identify the sources of $ 9,588 of deposits made in 1972, $ 29,697.45 in 1973, and $ 19,500 in 1976. [4] *319 By virtue of these unexplained bank deposits respondent, in his statutory notice of deficiency, determined that such amounts were includable in the Proctors' gross income for the years indicated. Issue 2. Charitable Contributions
The Proctors attended the Cloud Springs Baptist Church on a regular basis--Mrs. Proctor generally attending every Sunday and Proctor attending two to three times per month. During the years in issue, the Proctors made contributions to the church in the form of cash rather than using the church's envelope system which would have generated documentary evidence of their contributions. The Proctors claimed charitable contribution deductions in the amounts of $ 1,035, $ 1,035 and $ 6,000 on their joint individual income tax returns for the taxable years 1972, 1973 and 1976, respectively. *320 In his statutory notice of deficiency, respondent disallowed these deductions for charitable contributions because the Proctors failed to establish that contributions in the claimed amounts were made in the years in question. At trial, Proctor conceded that $ 4,000 of the amount claimed in 1976 was not deductible in that year. Issue 3. Interest Expense Deduction
On April 29, 1976 Proctor wrote a check to Chattanooga Products in the amount of $ 66,082.28. Such check was deposited in Chattanooga Products' bank account on that same date. At that time, Proctor owed Chattanooga Products $ 63,003.16. A notation on the check indicated that the check represented payment of principal of $ 63,003.16 and interest of $ 3,079.12. On June 30, 1976, Proctor borrowed $ 66,082.28 from Chattanooga Products. In addition, on April 29, 1976 Proctor wrote a check to R & D in the amount of $ 15,189.86. Such check was deposited in R & D's bank account on that same date. A notation on the check indicated that $ 15,000 represented payment of a note and $ 189.86 represented interest accrued on that note. No notes were introduced into evidence by either party. In his statutory notice of deficiency, *321 respondent disallowed the Proctors' claimed deduction for interest in the amount of $ 3,269 because the Proctors failed to establish that $ 3,079 of the amount transferred to Chattanooga Products and $ 190 of the amount transferred to R & D was for interest paid on a bona fide debt as required by section 163. Issue 4. Interest-Free Loans
During the years 1972 and 1973, the average monthly balances of Chattanooga Products' loans to Proctor were $ 40,804 and $ 13,393, respectively. The average prime interest rates for the years 1972 and 1973 were 5.125 and 8.58 percent, respectively. In his statutory notice of deficiency, respondent determined that Proctor realized income in the amounts of $ 3,060 in 1972 and $ 1,004 in 1973 from interest-free loans made to him by Chattanooga Products. Respondent calculated these income figures by applying a 7.5-percent interest rate to the average monthly balance of loans for each year. Issue 5. Constructive Dividends
a. Gift of a 1973 Corvette
During the years in issue, David Bowie was plant manager for Chattanooga Glass, a corporation unrelated to any of the petitioners herein. In this capacity, Bowie was responsible for making decisions concerning *322 the purchase of various cleaning products for his employer. It was Bowie's decision for Chattanooga Glass to buy all of its cleaning products from Chattanooga Products. Total sales from Chattanooga Products to Chattanooga Glass for the years indicated were as follows: Fiscal year ended
April 30,
Sales
1972
$ 7,733.05
1973
28,785.45
1974
58,875.74
Further, Bowie executed a lease dated September 17, 1973 on behalf of Chattanooga Glass providing for the rental of certain warehouse space from Jepco to Chattanooga Glass, Jepco's only customer. The lease provided for a 5-year term commencing February 1, 1974, with rent of $ 9,000 payable on the first day of each month. In addition, Chattanooga Glass was obligated under the lease to carry insurance and pay all utilities. During the period of time material to this issue, Chattanooga Products gave Bowie "plenty of booze." This size and type of gift giving is a generally accepted practice in the industry. However, sometime in late 1973, Chattanooga Products purchased and gave a 1973 Corvette to Bowie. Chattanooga Products did not deduct the cost of the Corvette on its corporate tax return. In his statutory notice of deficiency, respondent determined *323 the Proctor received dividend income in 1973 from Chattanooga Products in the amount of $ 6,156, the cost of the Corvette. b. Payment of Insurance Premiums
Chattanooga Products deducted medical insurance premiums paid for the benefit of Warren E. Cressman, Mrs. Proctor's brother, in the amount of $ 523.44 in each of the corporation's fiscal years ended April 30, 1972, April 30, 1973 and April 30, 1974. Cressman was not employed by Chattanooga Products during the years under consideration. In his deficiency notices, respondent determined that such amounts were not deductible by Chattanooga Products but were constructive dividends to the Proctors and were includable in their income for their 1972 and 1973 tax years (1974 tax year is not in issue). Petitioners concede the propriety of the former determination but contest the latter. Issue 6. Personal Use of Automobiles
During each of its fiscal years ended in 1972, 1973, 1974 and 1976, Chattanooga Products provided one automobile to each of the Proctors for their business and personal use. The corporation also paid for the costs associated with operating the vehicles which were either Cadillacs or Lincoln Continentals. Proctor drove *324 the automobile provided to him approximately 45,000 miles per year, a significant portion of which was for local or out-of-town business travel. His personal use of this automobile included commuting between his home and the office (3 miles one way) and a certain amount of weekend driving. The automobile used by Mrs. Proctor was driven by her or a Chattanooga Products employee approximately 15,000 miles per year. The business use of the automobile included trips to the post office (5 to 6 miles one way), bank (5 miles one way), accountant's office and customers' and suppliers' offices (10 to 12 miles one way). Mrs. Proctor also used the automobile for grocery shopping and to take the Proctors' children to school. Neither of the Proctors maintained records of their business and personal mileage. In his deficiency notices, respondent disallowed $ 3,591.60 of Chattanooga Products' claimed automobile expense deductions relating to these automobiles for each of the fiscal years ended in 1972, 1973, 1974 and 1976. Further, respondent determined that each of the Proctors received constructive dividends in the amount of $ 4,947 during their 1972 and 1973 taxable years due to personal *325 use of automobiles provided to them by Chattanooga Products. Issue 7. Payments to Irene Cressman
Chattanooga Products sold a product known as "Amazing Deodorant" during the years in question. Mrs. Proctor's mother, Irene Cressman (72 years old in 1972), played a major part in preparing this product for distribution and sale. Gallon jugs of the deodorant were delivered to Mrs. Cressman's home along with small bottles, caps, wicks, cartons, dividers, labels and glue. Thereafter, Mrs. Cressman filled each small bottle with deodorant, inserted a wick, double-capped and marked the bottle and placed it in a carton which she assembled and labeled. At all times material to these cases, Mrs. Cressman performed these same tasks for all of the "Amazing Deodorant" sold by Chattanooga Products. The following schedule sets forth the pertinent sales and salary figures relating to this product for the fiscal years indicated: Chattanooga Products'
Number of
Gross
Salary to
Fiscal Year Ended April 30,
Bottles Sold
Sales
Mrs. Cressman
1972
410 doz.
$ 9,840
$ 4,000
1973
500 doz.
12,000
6,000
1974
350 doz.
8,400
6,700
1976
*
*
1,800
Chattanooga Products deducted the payments *326 to Mrs. Cressman on its Federal income tax returns for the applicable years. Respondent disallowed the claimed deductions in total for the fiscal years ended April 30, 1973, April 30, 1974 and April 30, 1976. Further, respondent determined that the Proctors received constructive dividends in the amount of $ 4,000 in 1972 and $ 6,000 in 1973 and that such amounts are includable in their income in those years. Issue 8. Accumulated Earnings Tax
Proctor never graduated from high school and never received any formal business training. Despite this lack of formal education, Joseph E. Proctor parlayed his wisdom, motivation and later acquired business acumen into a successful going concern. Proctor began manufacturing a tire cleaner in the year 1956 as a sole proprietorship. As Proctor's business expanded, he required additional space and, therefore, moved his business operations from a small garage to a location on Dodds Avenue. On May 1, 1967, the business was incorporated as Chattanooga Products Co., Inc. pursuant to the advice of Warren E. Cressman, Proctor's brother-in-law. In 1968 the business operations again were moved to a location hereinafter referred to as 41st Street. *327 The 41st Street location was the principal place of business for both Chattanooga Products and R & D during the years at issue.
Despite Proctor's limited formal education, he infrequently sought professional advice and counsel. However, Proctor did utilize the services of an attorney on certain occasions (e.g., incorporation of Chattanooga Products). Further, Proctor engaged the services of a certified public accountant for assistance in the preparation of tax returns and other business matters. In addition, Proctor employed an accountant to assist in recordkeeping and other areas. The commercial chemical and cleaning compound business is highly competitive in nature, requiring a great deal of personal contact and business promotional activities. Nevertheless, from the outset Proctor was determined to succeed in the chemical business. Toward that objective, Proctor expended long hours in managing the business operations of Chattanooga Products as well as selling its products. Proctor realized that an important characteristic in achieving business stability, growth and success was Chattanooga Products' ability to obtain and maintain large customer accounts.In this regard, Chattanooga *328 Products, through Proctor, persistently solicited such customers, including Chattanooga Glass and Fleet Transport Company (Fleet). However, in order to obtain and maintain these large accounts, it was important that Chattanooga Products demonstrate both the ability and capacity to furnish the necessary chemicals and equipment. Chattanooga Products expended the following sums for additions to machinery and equipment in the fiscal years indicated below: Fiscal year ended
Amounts
April 30,
expended
1973
$ 27,985
1974
31,677
1975
3,463
Chattanooga Products made the following additions to the corporate plant and office buildings in the fiscal years as indicated below: Fiscal year ended
Amounts
April 30,
expended
1973
$ 1,039
1974
2,912
1975
18,810
Further, commencing in the fiscal year ended April 30, 1978, Chattanooga Products expended the sum of $ 92,935.06 for the expansion of its plant and office building located at 41st Street. Although Proctor expended substantial energy and resources in developing and maintaining Chattanooga Products' chemical business, he also attempted to expand the corporate business into unrelated areas. To this end, Proctor investigated and acquired certain properties and businesses. *329 During its fiscal year ended April 30, 1969, Chattanooga Products purchased from Fleet certain real estate consisting of land, an office building, and a garage at a cost of approximately $ 25,500. This property was leased to a tenant in February 1974. The pertinent provisions of the lease were as follows: LEASE-PURCHASE AGREEMENT 1. The term of this lease shall commence on February 1, 1974, and shall expire at midnight, January 31, 1976, with the right of the LESSEE to have the first option to purchase said Leased Premises for a purchase price of THIRTY-SEVEN THOUSAND SIX HUNDRED ($ 37,600.00) DOLLARS, payable in cash. LESSEE shall give LESSOR notice in writing at least sixty (60) days prior to the expiration date of this lease, whether or not he desires to purchase said Leased Premises, in order to exercise the first option heretofore set forth. Should said LESSEE desire to exercise said option and purchase said property, then and in such event, LESSEE shall be responsible for all closing costs, preparation of deeds, payment of transfer taxes, and like expenses involved in the closing of a real estate transaction. In such event, LESSEE shall also assume the property taxes for *330 the year 1976. 2. LESSEE shall pay to LESSOR promptly on the first day of each month, in advance, as rental during the term of this lease, the sum of THREE HUNDRED ($ 300.00) DOLLARS, the first such rental payment being due on February 1, 1974. 3. LESSOR does hereby lease the aforesaid premises to LESSEE to be used in the heavy equipment and related line of business. Said Leased Premises shall not be used for any other line of business without the express written consent of LESSOR herein. 4. LESSEE accepts the premises in their present condition and as suited for the use intended for his occupancy and LESSEE further agrees to take proper care of the premises and return same to LESSOR in as good a condition as when first leased, normal wear, tear and depreciation excepted. 7. LESSEE shall hold LESSOR harmless on account of any damage or injury to the person or property of LESSEE, or other persons however caused, and LESSEE agrees and shall be required to keep in force public liability and casualty insurance covering said premises during the term of this lease in an amount not less than $ 50,000.00. LESSEE shall, upon execution of this agreement, furnish LESSOR with a copy *331 of said policy and copies of any subsequent endorsements or new policies. 9. LESSEE shall pay for all taxes, assessments, charges and other governmental taxes, impositions levied, assessed or imposed upon LESSEE's personal property, inventory or equipment during the term of this lease. 13. LESSEE shall pay for all utilities used in connection with the Leased Premises. The tenant exercised its purchase option upon termination of the lease term in 1976. In January 1970 Chattanooga Products acquired the Brainerd Motel at a cost of approximately $ 198,000. Proctor was involved in the overall management of the motel while another employee of Chattanooga Products managed its day-to-day operations. The motel was sold by Chattanooga Products in September 1972. Late in 1969, Chattanooga Products investigated the possibility of acquiring a Ford dealership franchise. It secured approval from the Ford Motor Company and sold a piece of land to raise needed capital for the purchase. Despite Proctor's efforts in favor of Chattanooga Products, the planned purchase never reached fruition and was abandoned prior to 1972. During its fiscal years ended April 30, 1973 and April 30, 1974, Chattanooga *332 Products invested $ 248,502.98 in land, building and equipment for a skating rink to be operated by Fort-Lake. The land was acquired in early May 1972.Chattanooga Products acted as general contractor during the construction of the skating rink which was completed in the beginning of Chattanooga Products' April 30, 1974 taxable year. Thereafter, the skating rink was leased to Fort-Lake.Although the character and duration of the lease are not totally clear, it appears that Fort-Lake paid $ 2,500 per month in rent and Chattanooga Products provided a telephone answering service and maintained the financial records for Fort-Lake. The telephone answering service included answering the telephone for Fort-Lake during the day when the skating rink was closed and booking skating parties that resulted from these telephone inquiries. As reported on its Federal income tax returns, Chattanooga Products' statements of financial position as of April 30, 1972, April 30, 1973 and April 30, 1974 were as follows: 4/30/72
4/30/73
4/30/74
ASSETS
Current Assets: Cash
$ 119,009.61 $ 105,051.51 $ (2,305.55)
Accounts and notes
receivable-trade
37,457.58 45,659.04 48,574.89 Inventories
13,732.56 8,451.62 14,690.02 Other current assets
435.01 8,051.68 Due from R & D
36,644.81 9,496.93 11,650.15 Loans to Fort-Lake
Skating, Inc.
20,000,00 14,416.80 Loans to Proctor
42,699.18 13,221.52 11,082.54 Loans to Jepco
170,360.68 Loans to others
2,000.00 4,713.32 3,350.00 Total Current Assets
$ 251,978.75 $ 206,593.94 $ 279,871.21 Other Assets: Mortgage and real
estate loans
18,193.17 Depreciable assets
134,203.00 140,108.77 151,531.10 Accumulated depreciation
(34,546.90)
(47,210.53)
(52,992.39)
Land
20,158.89 20,158.89 19,631.09 Investment in skating
rink land, building
and equipment
219,006.95 248,502.98 Accumulated depreciation
(8,260.53)
Total Assets
$ 389,986.91 $ 538,658.02 $ 638,283.46 *333 4/30/72
4/30/73
4/30/74
LIABILITIES AND STOCKHOLDERS
EQUITY
Current Liabilities: Accounts payable -
trate
$ 22,475.75
$ 17,756.89
$ 22,996.32
Accrued salary
payable
25,000.00
39,000.00
Accrued taxes,
payroll and sales
9,628.89
11,522.85
12,518.69
Accrued taxes -
income
31,510.77
48,884.18
57,390.27
Other - employee
funds
130.06
Note payable to
Proctor
20,000.00
Total Current
Liabilities
$ 63,745.47
$ 123,163.92
$ 131,905.28
Capital Stock
55,568.32
55,568.32
55,568.32
Retained Earnings
270,673.12
359,925.78
450,809.86
Total Liabilities and
Stockholders'
Equity
$ 389,986.91
$ 538,658.02
$ 638,283.46
Chattanooga Products' accumulated earnings and profits at the beginning of its fiscal year ended April 30, 1972 were $ 204,446.18 and its inventory on that date was $ 16,840.88. In addition, Chattanooga Products reported income and deductions on its Federal income tax returns as of April 30, 1972, April 30, 1973, April 30, 1974 and April 30, 1975 as follows: 4/30/72
4/30/73
4/30/74
4/30/75
Sales (net)
$ 405,783.24
$ 463,865.31
$ 541,142.63
$ 442,408.00 Cost of Goods
Sold
153,343.53
170,922.78
180,214.04
182,910.00 Gross Profit
252,439.71
292,942.53
360,928.59
259,498.00 Other Income
10,702.40
23,784.28
35,919.21
46,521.00 Total Income
263,142.11
316,726.81
396,847.80
306,019.00 Depreciation
14,375.93
19,353.33
20,228.16
31,763.00 Other Expenses
134,033.47
141,236.64
213,345.29
260,952.00 Total
Deductions
148,409.40
160,589.97
233,573.45
292,715.00 Taxable Income
$ 114,732.71
$ 156,136.84
$ 163,274.35
$ 13,304.00 Total Tax
48,505.77
66,884.18
72,390.27
5,244.00 Estimated Tax
Payments
22,995.00
18,000.00
15,000.00
7,000.00 Tax Due
(overpayment)
$ 25,510.77
$ 48,884.18
$ 57,390.27
($ 1,756.00) *334 Proctor did not enter into written loan agreements with Chattanooga Products and did not pay interest to Chattanooga Products with respect to loans reflected in the financial statements hereinabove. The loans by Chattanooga Products to Fort-Lake also were not evidence by written loan agreements. Petitioners Joseph and Shirley Proctor, directors of Chattanooga Products, discussed the business matters of Chattanooga Products on a regular basis but did not maintain minutes or formal records of these discussions. [5] *335 From its incorporation on May 1, 1967 through July 15, 1974, Chattanooga Products never declared or paid dividends to its stockholders. Any dividends received by the Proctors from Chattanooga Products during their 1972, 1973 and 1974 taxable years would have been subject to individual Federal income tax rates of at least 60 percent. For its fiscal years ended April 30, 1972, April 30, 1973 and April 30, 1974, Chattanooga Products was subject to the maximum corporate tax rate of 48 percent. On June 28, 1978 respondent notified Chattanooga Products that a proposed statutory notice of deficiency for the taxable years ended April *336 30, 1972, April 30, 1973 and April 30, 1974 included deficiencies in tax related to the accumulated earnings tax under section 531. Chattanooga Products timely submitted a statement, pursuant to section 534(c), setting forth the grounds on which it relied to establish that all or any part of its earnings had not been permitted to accumulate beyond the reasonable needs of its business. In its section 534(c) statement, Chattanooga Products set forth the following grounds for its accumulation of earnings: (1) for expansion of its plant and equipment to meet the needs of its chemical business, (2) to finance an increase in working capital needed to maintain its business growth, (3) to continue the expansion of its real estate rental business, and (4) to provide for adequate financial strength needed to meet its competition in the chemical business. On June 29, 1978 respondent mailed a statutory notice of deficiency to Chattanooga Products in which respondent determined, interalia, that Chattanooga Products was liable for the accumulated earnings tax imposed by section 531. On May 5, 1980 this Court ruled that the burden of proof is on Chattanooga Products with respect to whether its *337 earnings and profits were permitted to accumulate beyond the reasonable needs of its business. [6] *338 *339 *340 Issue 9. Depreciation Expense--R & D
R & D had customers who owned trucks and other vehicles that required cleaning on a regular basis. It was customary for R & D to install their spray washers on the premises of customers in order to encourage the purchase of R & D's cleaning compounds. Sometimes these spray washers would be purchased by the customers pursuant to written or oral conditional sales contracts. Under a typical contract, the customer agreed to purchase such equipment from R & D at a defined purchase price. Further, the customer agreed to purchase a certain quantity per month of cleaning products from R & D at a specified price per gallon to use in the spray washers. Generally, $ .50 of the purchase price of each gallon of cleaning product was applied against the purchase price of the equipment. R & *341 D retained title to the equipment until all sums due under the contract were paid in full. The customer was required to keep the equipment in good and serviceable condition, insure the equipment, and pay all taxes and other charges against said equipment. In addition, the loss or destruction of such equipment did not release the customer from any liability under the contract. In its 1975 fiscal year, R & D acquired or built equipment from component parts and installed the equipment at customer locations pursuant to conditional sales contracts. The corporation claimed depreciation deductions on this new equipment as follows: Fiscal year ended
Claimed
April 30,
depreciation
1975
$ 2,963.75
1976
3,765.00
1977
1,730.20
Further, on its April 30, 1975 Federal tax return, R & D claimed a section 38 investment tax credit based on the cost of such equipment. In his statutory notice of deficiency respondent disallowed all of R & D's deductions for depreciation on such equipment as well as the investment tax credit thereon. Issue 10. Allocation of Purchase Pice--R & D
Atco Manufacturing Co., Inc. (Atco) was involved in various businesses, including supplying customers with equipment to clean their *342 trucks and other vehicles. In that regard Atco owned 51 used high-pressure spray washers, 2 used drive-through spray washer systems and a few service parts. All but two of the high-pressure spray washers were located on the premises of Atco's 43 customers.
Prior to 1974, Atco's spray washer business was deteriorating and a substantial portion of is equipment was in ill repair. Atco desired to extricate itself from this business.To this end, Atco and R & D entered into negotiations regarding the acquisition by R & D of Atco's spray washer business. These negotiations culiminated on July 3, 1974 with the execution by Atco and R & D of a Sales Agreement (Agreement). The Agreement provided in pertinent part as follows: SALES AGREEMENT
THIS AGREEMENT, made and entered into this 3 day of July, 1974, by and between R & D PRODUCTS CORPORATION (a corporation organized and existing under the laws of Tennessee with its principal place of business in Chattanooga, Tennessee), hereinafter called "BUYER", and ATCO MANUFACTURING CO., INC. (a corporation organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia), hereinafter called "SELLER); WHEREAS, *343 BUYER is acquiring from SELLER its entire Fleet Cleaning equipment business and customers (below listed), to include all fleet cleaning equipment and stock on site at these particular customer accounts plus all inventory, stock in trade, equipment, supplies, and other related assets in stock or on location at SELLER'S business at 1195 Menlo Drive, N. W., Atlanta, Georgia, and WHEREAS, BUYER now becomes sole owner of said Fleet Cleaning equipment and can solicit the sale of products to be used through said equipment at the following customer accounts: [The Agreement continued by listing 43 Atco customers and the type and number of spray washers located on each customer's premises.] NOW, THEREFORE, in consideration of TWENTY THOUSAND ($ 20,000.00) DOLLARS in hand tendered by BUYER to SELLER, receipt whereof is hereby acknowledged, it is mutually agreed as follows: 1. SELLER agrees to have his representative go with a representative of BUYER to each STARRED account deemed necessary by BUYER a minimum of three times in order to expedite transition of the account to BUYER, and SELLER shall use its best efforts to assist BUYER in all customer relations. [21 customers were "starred" by *344 the parties.] 2. SELLER releases and said BUYER shall be allowed to retain the serviceman presently working for SELLER in the fleet cleaning operation. Said serviceman shall not be re-employed by SELLER for a period of 24 months. 3. SELLER shall provide to BUYER all information and assistance as to their suppliers of parts and component parts of said Fleet cleaning equipment as well as any design drawings, engineer layout plans, specification and like documents as to the Fleet Cleaning Equipment. 4. SELLER is hereby prohibited from competing with BUYER in the manufacture, distribution, or selling of any and all fleet washing equipment to include automatic drive-through systems, high pressure washers, steam cleaners, component parts or service pertaining to truck fleet cleaning systems. This non-competitive restrictive convenant shall remain valid for 48 months from the date of this agreement. 5. SELLER agrees that for a period of 48 months he will not sell or solicit sales of products to be used through fleet washing equipment to the accounts covered in this agreement. BUYER agrees that SELLER shall be allowed to continue the sale of products not related to fleet washing equipment *345 to the accounts specified in this agreement. 6. BUYER agrees to pay SELLER as a purchase price of said business, an amount determined as follows: TWENTY THOUSAND ($ 20,000.00) DOLLARS with the execution of this sales agreement plus 10% of the gross monthly chemical sales for the next 12 months to the aforelisted 43 customers accounts, due on the 25th day of each month following, with the total purchase price being based and determined upon the first 12 months chemical sales volume. Should said amount be $ 120,000 or less gross annual chemical sales, the total purchase price shall be SIXTY THOUSAND ($ 60,000.00) DOLLARS. Should said amount be $ 150,000 or more gross annual chemical sales, the total purchase price shall be SEVENTY-THREE THOUSAND ($ 73,000.00) DOLLARS. If the gross annual chemical sales for the first 12 months to the 43 aforelisted customer accounts is between $ 120,000 and $ 150,000 then the purchase price shall be prorated between $ 60,000 and $ 73,000. Upon determination of the total purchase price the initial $ 20,000.00 plus 10% of the first years sales volume already paid shall be deducted from the total purchase price and the balance shall be due and payable *346 in 24 equal monthly payments, or, by mutual agreement of BUYER and SELLER, said balance may be paid in full at that time. 7. Both parties warrant, covenant, and represent that they are duly empowered to execute the above and foregoing SALES AGREEMENT and have fully read and understand the contents of same. After the 12-month period provided for in Article 6 of the Agreement, the total purchase price was determined to be $ 60,000. The Agreement did not allocate the purchase price among the assets purchased. However, R & D, on its own accord, allocated the purchase price as follows: Equipment: 51 High-pressure washers
$ 46,000
2 Drive-through systems
7,000
Inventory: Parts
7,000
$ 60,000
The amounts allocated to the equipment were capitalized and depreciated by R & D using estimated useful lives of 7 years. Deductions claimed by R & D for depreciation of this equipment for the indicated fiscal years were as follows: Fiscal year ended
Depreciation
April 30,
claimed
1975
$ 11,528.58
1976
8,608.00
1977
6,763.00
The portion of the purchase price allocated to parts inventory was charged to cost of goods sold in the year of purchase. On or about January 31, 1975 R & D sold four of these high-pressure *347 washers to a customer for $ 300 per unit. Using this figure as a benchmark, respondent, in his notice of deficiency, reallocated the purchase price as follows: 51 High-pressure washers
$ 15,300
2 Drive-through systems
1,400
Convenant not to compete
12,000
Goodwill
31,300
Total
$ 60,000 Based on this allocation, respondent recomputed the deductions for depreciation of such equipment using 7-year useful lives and reallocated the deductions for amortization of the cost allocated to the convenant not to compete using a 4-year useful life -- Fiscal year ended
Depreciation
Amortization of
April 30,
of equipment
covenant not to compete
1975
$ 4,410.70
$ 2,500.00
1976
2,376.27
3,000.00
1977
1,867.07
3,000.00
Consistent with its cost allocation, respondent disallowed the writeoff of $ 7,000 in parts inventory to cost of goods sold for the fiscal year ended April 30, 1975. OPINION Issue 1. Unexplained Deposits
We must determine whether Proctor received unreported income, as determined by respondent from unexplained bank deposits, during 1972, 1973 and 1976. The Proctors are required to maintain records sufficient to show the amount of their income subject to tax. Section 1.6001-1, Income Tax Regs. Should such *348 records prove inadequate, the Commissioner is empowered to recompute the Proctors' income so that it is clearly reflected on their tax returns. Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). In the instant case, the respondent examined Proctor's bank deposits in an attempt to identify their source. Respondent determined that Proctor had received unreported income equal to the sum of the unexplained deposits. Respondent's methodology is not unfamiliar to this Court. Hague Estate v. Commissioner, 132 F.2d 775, 776 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941), cert. denied 318 U.S. 787 (1943); Estate of Mason v. Commissioner, supra at 655-656. It is undeniable that bank deposits standing alone are not enough to support respondent's determination that Proctor had unreported income.See Goe v. Commissioner, 198 F.2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952).However, circumstances surrounding the bank deposits may give rise to a fair inference that certain of these deposits represented unreported income. Hague Estate v. Commissioner, supra at 776. When circumstances exist to justify an inference *349 of unreported income, respondent's determination in this regard is not arbitrary and capricious. Rodney v. Commissioner, 53 T.C. 287, 315 (1969); Hague Estate v. Commissioner, supra at 776. In that event, petitioners have the unenviable burden of proving that respondent's determination is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933). Proctor contends that respondent's determination is arbitrary because respondent has not made a reasonable effort to establish the source of the alleged unreported income and the circumstances surrounding the bank deposits did not dictate a need to resort to this unexplained deposits approach. We disagree with Proctor on both scores. Proctor made large deposits to his personal accounts. Many of these deposits were in the form of cash. Proctor could not identify the source or nature of a number of these deposits because of inadequate records or other undisclosed reasons. In addition, during those years Proctor was involved in numerous business ventures including successful chemical businesses, a roller skating rink and a motel. Proctor exercised significant, if not controlling, influence *350 over such business ventures. Moreover, Proctor apparently had the ability and the opportunity to withdraw funds from his corporations for personal use. In fact, Proctor's testmony indicates that he considered his personal affairs and the affairs of his businesses to be synonymous. Certainly a fair inference can be drawn from these facts that the unexplained deposits represented unreported income either from Proctor's business ventures or other sources. Proctor contends that the unexplained deposits are a result of his unique system of cash management. Proctor insists that such deposits represent previously taxes income. In support of his position, Proctor testified that he normally cashed his payroll checks and then often carried this cash around in his pocket for days or a week at a time. He claimed that thereafter he often deposited the cash in the bank or carried the cash home where it was placed in the security of one or more cigar boxes. Proctor testified that, on other occasions, he might deposit some of the cash from the cigar boxes when he felt the urge to earn some interest on this money. Therefore, petitioner reasons, the unexplained deposits represent previously *351 taxed compensation which met with voluntary delay in transit to the bank. This Court does not feel bound to accept the assertions of a petitioner that are improbable, unreasonable or questionable.The Court may determine the credibility of such assertions after considering the manner in which testimony is presented, the demeanor of the witnesses, the reasonableness of their testimony and the witnesses' interest in the subject matter. Upon such consideration, we find Proctor's assertions are not credible. A few examples should suffice to pinpoint the basis for our finding. First, Proctor testifed that a major source of the unexplained deposits was his cigar box "nest egg" which, at times, allegedly contained sums in excess of $ 70,000. Proctor's testimony regarding this nest egg is left totally uncorroborated. Conspicuously absent in the record is any mention of this nest egg by Mrs. Proctor. Had this nest egg actually existed, we are convinced that Mrs. Proctor would have been aware of it and would have testified to that effect. Second, during the years in question, Proctor borrowed significant sums of money from related corporations. We find it highly improbable that such *352 borrowings occurred contemporaneously with the possession and expansion of the alleged nest egg. Third, Proctor made three separate $ 5,000 deposits in January, March and May of 1976. While Proctor was unable to identify the nature of the deposits, the source of at least the first of these was identified to be David Berry. We are unwilling to believe that Proctor could not remember the underlying facts with respect to these deposits, especially when considering their magnitude and the fact that the source of at least the first deposit was disclosed. Consequently, we are unconvinced by Proctor's testimony. Proctor attempted to bolster his testimony by submitting into evidence a detailed schedule covering the years 1972, 1973 and 1976 which purported to reflect the sources and amounts of cash received by the Proctors during those years. By comparing the total sources of cash available for deposit with the portion of those amounts actually traced to bank deposits by respondent, Proctor hoped to demonstrate that a significant portion of cash received during each of those years was not traced to bank deposits. Therefore, Proctor would have us conclude that the unexplained deposits *353 were composed of untraced sources of cash received by Proctor. While such a comparison may have some probative value, we find that certain assumptions underlying Proctor's comparison schedule do not comport with the evidence. For example, in calculating the sources of cash available for deposit, Proctor included, among other items, expense checks that he received and payroll and expense checks that Mrs. Proctor received from Chattanooga Products and R & D. Proctor, however, testified that he cashed his expense checks and spent the cash for business purposes. Therefore, it appears that these funds were not available for deposit. In addition, Mrs. Proctor testified that her payroll checks either were deposited in her own separate account or were used to pay personal expenses. Further, there is no evidence to suggest that Mrs. Proctor's expense checks would have been deposited in Proctor's bank accounts. To the contrary, it is more reasonable to presume that she disposed of her expense checks in a manner consistent with the disposition of her payroll checks; that is, such expense checks either were deposited in her own separate account or were used to pay other expenses.
Also, interest *354 income earned on other bank accounts and from other sources was included in Proctor's schedule as cash received and potentially available for deposit in his accounts.We question the validity of including various amounts of interest income as sources of deposits. At least with regard to interest income from other bank accounts, we would assume that such income was credited to these other accounts directly and not deposited in the subject bank accounts. The evidence, although scant, appears to bear us out on this point. There is also a major information gap in the schedule which further places its probative value in serious question.Proctor's schedule fails to account for his cash outlays, including but not limited to expenditures in connection with personal expenses and investments. [7] *355 Just as bank deposits standing alone do not establish income, Hague Estate v. Commissioner, supra, neither do sources of cash standing alone prove the source and nature of unexplained deposits. Therefore, this schedule has questionable probative value. It is incumbent on Proctor to prove the impropriety of respondent's determination. Unconvincing testimony and documentary evidence cannot serve to satisfy that burden. Accordingly, Proctor has failed to meet his burden of proving that the unexplained deposits are not additional income. Therefore, we hold for respondent on this issue. Issue 2. Charitable Contributions
The second issue requires us to decide whether the Proctors are entitled to charitable contribution deductions as claimed on their returns for the taxable years 1972, 1973 and 1976.Section 170(a)(1) provides that a deduction shall be allowed for charitable contributions paid in the tax year. The taxpayer has the burden of proving that he is entitled to the claimed charitable deduction. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, supra.
On brief, the Proctors contend that their uncorroborated testimony is sufficient to establish their entitlement to charitable contribution deductions of at least $ 1,000 for each of the years 1972, 1973 and 1976. Respondent, on the other hand, contends that such testimony without corroborative documentary *356 evidence is insufficient to establish any amount of charitable contribution deductions. We see no need to dwell on an extended analysis of the facts. Suffice it to say we are satisfied that the Proctors attended church and made charitable contributions to their church during the years under consideration. However, we are not convinced by petitioners' testimony with respect to the amounts of such contributions. Applying the so-called Cohan rule, and "bearing heavily" against the Proctors whose "inexactitude" is of their own making, we hold that the Proctors are entitled to a charitable contribution deduction under section 170(a)(1) of $ 350 for each of the years 1972, 1973 and 1976. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Issue 3. Interest Expense Deductions
We next address the issue of whether Proctor is entitled to an interest expense deduction under section 163 for payments made to Chattanooga Products and R & D in 1976. Section 163(a) allows a cash basis taxpayer such as Proctor to deduct interest paid, in the form of cash or its equivalent, on bona fide indebtedness. Proctor has the burden of proving that he is entitled to an interest expense deduction under *357 section 163(a). Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, supra.
a. Chattanooga Products' Loan
On April 29, 1976, Proctor negotiated his personal check in the amount of $ 66,082.28 to Chattanooga Products of which $ 63,003.16 allegedly represented principal and $ 3,079.12 allegedly represented interest owed to Chattanooga Products as of that date. About 2 months later, Proctor borrowed precisely the same amount ($ 66,082.28) from Chattanooga Products.We must determine whether a portion of the April 29, 1976 transfer ($ 3,079.12) constituted interest "paid" for purposes of section 163(a). Although respondent does not contest the validity of Proctor's interest and principal obligations to Chattanooga Products as of April 29, 1976, respondent argues strenuously that Proctor's aforementioned borrowing and lending scheme was a sham designed only to secure an interest deduction for Proctor. Respondent points out that except for the bief period between the April 29 transfer and the later borrowing of the identical amount, Proctor experienced no change in his economic position. Thus respondent insists that Proctor, in substance, had not paid interest *358 to Chattanooga Products within the meaning of section 163(a). Proctor maintains that he is entitled to a deduction in the amount of * 3,079.12 for interest paid to Chattanooga Products in 1976. In response to respondent's sham argument, Proctor points out that moneys were actually paid to Chattanooga Products and that the corporate records properly reflected the interest and principal payments. Neither Proctor nor respondent have cited any case authority in support of their opposing positions. We begin with the proposition that the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). A sham transaction is one which lacks economic substance; such a transaction may be disregarded for tax purposes. Knetsch v. United States, 364 U.S. 361, 365-366 (1960); Braddock Land Co. v. Commissioner, 75 T.C. 324 (1980). In determining whether a transaction is simply a sham, our inquiry focuses on "whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469 (1935). Accordingly, Proctor must establish that "what was done *359 * * * was the thing" which section 163(a) intended.Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, supra.
This and other courts have denied interest deductions to cash basis taxpayers where an interest obligation was satisfied by a taxpayer's note rather than by cash or its equivalent. See, e.g., nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 624-625 (1964) and the cases cited therein. This rule was clearly set forth in Cleaver v. Commissioner, 6 T.C. 452, 454 (1946), affd. 158 F.2d 342 (7th Cir. 1946), cert. denied 330 U.S. 849 (1947) as follows: If an interest obligation is satisfied by the execution of a new note by the debtor on a cash basis, the interest will not be considered as "paid" within the meaning of section * * * [163(a)]. [Cits. omitted.] Similarly, where a taxpayer on the cash basis who is indebted on a note for past due interest borrows from his creditor an amount in excess of this past due interest on a second note, and the creditor gives to the taxpayer the principal amount of the second note less the amount of past due interest on the first note and marks this interest "paid," we have held that no cash payment has been *360 made which would warrant a deduction. [Cits. omitted.] In contrast, we allowed an interest deduction where a taxpayer borrowed cash from a greditor, commingled the cash with the taxpayer's other funds and, shortly thereafter, used the commingled funds to satisfy his interestobligation to that same creditor. Burck v. Commissioner, 63 T.C. 556, 559-560 (1975), affd. 533 F.2d 768 (2d Cir. 1976); Burgess v. Commissioner, 8 T.C. 47, 49-50 (1947). See also Wilkerson v. Commissioner, 70 T.C. 240, 258-259 (1978), on appeal (9th Cir., October 1, 1979). While those cases have some distinguishing features, we believe that the principles espoused therein have application to the instant case. Proctor satisfied his interest and principal obligations to Chattanooga Products by a personal check in the amount of $ 66,082.28. The check was deposited in the corporation's bank account and was commingled with the other corporate funds contained therein. Proctor clearly relinquished his personal dominion and control over these funds. Although Proctor subsequently borrowed a similar amount from Chattanooga Products, the original $ 66,082.28 could not be traced to the subsequent borrowing for it had *361 lost its identity in the corporate bank account. Burgess v. Commissioner, 8 T.C. at 50. Based on these facts and prior case law, we find that Proctor made an interest payment to Chattanooga Products and is entitled to a $ 3,079.12 interest deduction under section 163(a). We believe that the standard enunciated in Cleaver does not command a contrary result. The realities of the instant situation are that Proctor actually made interest and principal payments to Chattanooga Products. Proctor sacrificed the use of such funds to the corporation for two months. Only then did Proctor borrow additional funds from the corporation. This second borrowing was not an unusual event as Proctor frequently borrowed funds from his related corporations. In substance and in form, Proctor had not borrowed funds to satisfy his interest obligation; neither had he simply exchanged notes. Accordingly, we hold for petitioner on this issue. b. R & D's Loan
On April 29, 1976, Proctor wrote a check to R & D in the amount of $ 15,189.86. Such check was deposited in R & D's bank account on that same date. Proctor testifed that this check was transferred to R & D in satisfaction of a debt that he owed *362 to the corporation. This testimony is reinforced by a notation on the check which indicated that $ 15,000 represented payment of a note and $ 189.86 represented interest accrued on that note. Based on our careful examination of the entire record, we find that Proctor has established the existence of a bona fide indebtedness to R & D in the principal amount of $ 15,000 plus accrued interest of $ 189.86 as of April 29, 1976 and that the subject check was transferred to R & D in satisfaction of that debt. Accordingly, because Proctor has met the requirements of section 163(a) with respect to the R & D idebtedness, we hold for him on this issue. Issue 4. Interest-Free Loans
The next issue for our determination is whether Proctor realized income in the form of an economic benefit from interest-free loans from Chattanooga Products. Respondent concedes that the decision in the present case is controlled by Dean v. Commissioner, 35 T.C. 1083 (1961), as explained by Greenspun v. Commissioner, 72 T.C. 931 (1979), on appeal (9th Cir. November 20, 1979). Thus respondent asks this Court, again, to reverse our decision in Dean. As we said in Creel v. Commissioner, 72 T.C. 1173, 1179 (1979), *363 affd. sub nom. Martin v. Commissioner,     F.2d     (5th Cir., July 6, 1981, 48 AFTR 2d 81-5537, 81-2 USTC par. 9534), "We again decline * * * respondent's invitation to reverse our decision in Dean." For reasons well expressed in Dean, Greenspun, Creel and other cases considering this issue, we refuse to hold that the mere loan of money interest-free creates income to the borrowers. [8] Accordingly, under the rationale expressed in the above-cited cases, we find for the petitioners on this issue. Issue 5. Constructive Dividends
It is well settled that nondeductible corporate payments made to a third party on behalf of or for the economic benefit of its shareholders may constitute dividends taxable to those shareholders under section 301. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1114-1115 (1957), affd. 262 F.2d 150 (9th Cir. 1958); *364 Paramount-Richards Theaters, Inc. v. Commissioner, 153 F.2d 602 (5th Cir. 1946), affg. a Memorandum Opinion of this Court; Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977). The controversy surrounding this issue only involves whether either of the Proctors received an economic benefit as a result of certain transfers made by Chattanooga Products. The Proctors claim that they received no economic benefit from the gift of the Corvette to Bowie by Chattanooga Products and the payments made by Chattanooga Products on behalf of Warren Cressman. Respondent, as expected, contends that the Proctors did receive an economic benefit as a result of these transfers.Proctor has the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, supra.
a. Gift of 1973 Corvette During the years in issue, Bowie purchased cleaning products for Chattanooga Glass from Chattanooga Products. Sales to Chattanooga Glass increased significantly during Chattanooga Products' 1972, 1973 and 1974 tax years. Sometime late in calendar year 1973, Chattanooga Products purchased and gave a 1973 *365 Corvette to Bowie. Based on all of the testimony, Proctor claims that the reason for making the "gift" was because of the substantial amount of business Bowie was able to secure for Chattanooga Products from Chattanooga Glass, Bowie's employer. Proctor contends that there was a valid corporate business purpose for such "gift" and that he received no economic benefit therefrom. He therefore reasons that no dividend should be attributed to him. Respondent counters by pointing out that Bowie was responsible for Chattanooga Glass entering into a lease agreement with Jepco, Proctor's wholly-owned corporation.The lease in question was executed in September 1973 with occupancy of Jepco's warehouse to begin February 1, 1974. Respondent insists that, while it may be true that Chattanooga Glass purchased cleaning products from Chattanooga Products during the years in issue, the timing of the "gift" indicates its connection with the lease of the Jepco warehouse. Therefore, respondent asserts that Proctor received a constructive dividend because he caused Chattanooga Products to make the "gift" to Bowie for the benefit of Jepco. We realize that Chattanooga Products' sales to Chattanooga *366 Glass increased from $ 7,733.05 in the year ended April 30, 1972 to $ 58,875.74 in the year ended April 30, 1974. In recognition and appreciation for such sales, Chattanooga Products gave Bowie "plenty of booze" and other gifts of this nature and size--a widespread industry practice. However, we doubt that the sales increases prompted the gift of the Corvette as Proctor would have us believe, especially considering that Bowie had the discretion to change suppliers at any time. In sum, we found Proctor's testimony to be vague and unconvincing and Bowie's testimony to totally lack credibility. On the other hand, the trial record reveals a much more significant and convincing reason for the "gift"; that is, the Jepco lease. The lease was a binding written contract which had a 5-year term did involved $ 540,000 of total rent. Moreover, the Jepco lease became effective at approximately the same time that the transfer was made. Based on these facts, we are convinced that the transfer of the Corvette to Bowie was an inducement or a gesture of appreciation (to put it gently) in connection with the Jepco lease, rather than in connection with Chattanooga Products' business. Proctor received *367 an economic benefit from such gift by virtue of his 100-percent ownership of Jepco. See Johnson v. Commissioner, 47 AFTR 2d 81-1460, 81-1 USTC par. 9414 (6th Cir. 1981), affg. by order a Memorandum Opinion of this Court. Therefore, we hold that Proctor constructively received a dividend in the amount of $ 6,156 (the cost of the Corvette) from Chattanooga Products for the year 1973 as a result of the corporation's transfer of a 1973 corvette to Bowie. b. Payment of Insurance Premiums
Chattanooga Products paid medical insurance premiums in the amount of $ 523.44 for each of its fiscal years ended April 30, 1972, April 30, 1973 and April 30, 1974 for the benefit of Warren E. Cressman, Mrs. Proctor's brother. Although such amounts were deducted in the years paid, Chattanooga Products has conceded that they are not deductible expenditures. Cressman was not an employee of Chattanooga Products during the years in issue. Further, petitioners offered no evidence to show that these payments somehow benefited Chattanooga Products. The Proctors have not met their burden of proof because of their failure to offer any evidence on this issue. Therefore, we must hold for respondent; that *368 is, the amount of such premium payments are dividends to be included in income by the Proctors. [9] The Proctors constructively received dividends of $ 523.44 in both their 1972 and 1973 tax years. Issue 6. Personal Use of Automobiles
We must determine whether expenses related to the Proctors' use of certain automobiles were properly deductible by Chattanooga Products, and whether the Proctors received constructive dividends resulting from the personal use of such automobiles. Respondent disallowed $ 3,591.60 [10] of deductions taken by Chattanooga Products in each of its fiscal years 1972, 1973, 1974 and 1976 because such amounts related to the Proctors' personal use of corporate automobiles. In addition, respondent determined that the Proctors constructively received dividends of $ 4,947 [11] in their 1972 and 1973 taxable years in connection with their personal use of such automobiles. The dividend computation *369 is based upon respondent's estimates of the fair rental value of each automobile and his estimate of operating expenses paid by Chattanooga Products but incurred in connection with such personal use.
It is well settled that, where corporate property is used by a shareholder for personal purposes not proximately related to the corporate business, the corporation is not entitled to deductions related to such personal use. The fair "rental" value related to the personal use of such property may be includable in the stockholder's income as constructive dividends. [12]
With regard to *370 disallowance of deductions, petitioner contends that the evidence shows the total personal mileage in each of the years at issue to be 12,050--4,550 for Proctor and 7,500 for Mrs. Proctor. Proctor testified that he commuted to and from work 6 days a week (3 miles one way). Proctor testified further that he drove two to three miles (one way) to and from church about three Sundays a month. In addition, he would occasionally take a Sunday afternoon drive. Proctor asserted that the remainder of the 45,000 miles per year that he drove was for business purposes. Based on this testimony Proctor estimates that his personal usage would total 4,550 miles in the course of a year. The corporate car used by Mrs. Proctor was driven approximately 15,000 miles per year by herself or other employees of Chattanooga Products. Mrs. Proctor stated that the car was used for business purposes to travel to the post office twice a day (5 to 6 miles one way), to go to the bank 3 to 4 times per week (5 miles one way), to drive to customers' or suppliers' locations (10 to 12 miles one way) and for other miscellaneous errands. From this testimony and the fact that the car was driven 15,000 miles per year, *371 petitioners estimated that Mrs. Proctor's personal use of such car was 7,500 miles per year. We agree with petitioners' estimate of Mrs. Proctor's personal usage. Despite the fact that detailed records were not maintained, we found Mrs. Proctor to be credible and forthright and her testimony to be specific as to distance and frequency of business travel. However, Proctor was not so convincing a witness. We simply do not believe that he could have confined his personal driving to the limited extent disclosed in his testimony. Certainly his parental obligations and his personal duties, necessities, loyalties and commitments placed transportation demands on Proctor.
We have the authority to approximate the amount of business expenses where, as in the instant case, the taxpayer has failed to maintain adequate records concerning business and personal transportation. Cf. Cohan v. Commissioner, supra. Accordingly, we find that in each of the fiscal years ended April 30, 1972, April 30, 1973, April 30, 1974 and April 30, 1976, Proctor's personal mileage amounted to 6,500 miles and Mrs. Proctor's personal mileage amounted to 7,500 miles. Therefore, we hold that $ 2,100 [13] of automobile *372 expense deductions should be disallowed to the corporation during each of those years. We next consider to what extent the Proctors have realized constructive dividends in connection with the personal use of the corporate automobiles. The Proctors contend that the amount of the constructive dividend should equal the amount of the disallowed deduction at the corporate level. We do not agree with this contention in the context of this case. The amount of the constructive dividend should be equal to the fair market value of the benefits involved. Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). It seems that *373 respondent used a fair rental value for each car of $ 250 per month. The Proctors do not contest the reasonableness of this figure. However, they do contest the reasonableness of respondent's apparent use of an estimate of 5 cents per mile for operating expenses in his determination of the deficiency. The Proctors contend on brief that they personally paid much of the expenses connected with the operation of the cars and therefore respondent's estimate is excessive. We believe the evidence does not support the Proctors' contention. The Proctors did not testify in support of this contention. Further, from a careful review of the entire record, we believe that the Proctors either received cash advances or reimbursements for such expenses. The Proctors have the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. They have failed to satisfy that burden as it relates to respondent's estimate of operating expenses per mile. Accordingly, we hold that the Proctors constructively received dividends includable in their income of $ 2,633.20 [14] in each of their 1972 and 1973 tax years (their 1974 tax year is not in issue). *374 Issue 7. Payments to Irene Cressman
We must determine whether the payments to Mrs. Proctor's mother, Irene Cressman, constituted deductible compensation expenses under section 162 during the taxable years in issue, and to what extent, if any, the nondeductible portion of such payments constitutes dividends constructively received by the Proctors. Section 162 provides in pertinent part as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; The inquiry regarding the *375 deductibility the compensation payments focuses on whether such payments are reasonable compensation for services rendered. Section 1.162-7(a), Income Tax Regs. The amount of reasonable compensation is a question of fact to be determined from all the facts and circumstances of the particular case. Boyle Fuel Co. v. Commissioner, 53 T.C. 162, 169 (1969). "[R]easonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Section 1.162-7(b)(3), Income Tax Regs. Petitioner has the burden of proving the reasonableness of the claimed compensation. Rule 142(a), Tax Court Rules of Practice and Procedure; Botany Worsted Mills v. United States, 278 U.S. 282, 289-290 (1929). In his original determination, respondent disallowed in total the deductions claimed by Chattanooga Products for payments to Irene Cressman in its fiscal years ended April 30, 1973, April 30, 1974 and April 30, 1976. On brief, respondent conceded that Irene Cressman performed valuable services for Chattanooga Products but took issue with the reasonableness of such compensation payments. Respondent claims that the value of Mrs. Cressman's *376 services was no more than $ 453.60, $ 480, and $ 336 for the three taxable years ended April 30, 1972, April 30, 1973 and April 30, 1974, respectively. Respondent also asserts that Mrs. Cressman did not perform any services for Chattanooga Products in its taxable year ended April 30, 1976. Furthermore, for each of the Proctors' 1972 and 1973 tax years, [15] respondent contends that the amount of unreasonable compensation paid to Irene Creesman represented disguised dividend distributions to the Proctors. Chattanooga Products contends that Mrs. Cressman rendered "valuable services to the company and that evidence of such value is determined, in the absence of contrary proof, by the * * * amounts of money paid." Petitioner continues by stating that it seems "logical that any business would pay costs of $ 6,000.00 for sales of $ 9,840.00 or costs of $ 6,700.00 for sales of $ 12,000.00." [16] Accordingly, petitioner contends that the amounts paid to Irene Cressman constituted reasonable compensation. Further, the Proctors claim that such amounts which might be determined to be unreasonable compensation and not deductible by Chattanooga Products *377 are not dividends because no personal benefit was received therefrom. First, petitioner is mistaken with respect to where the burden of proof lies. Chattanooga Products has the burden of proving that the payments to Irene Cressman constituted reasonable compensation. It is not respondent's burden to come forward with contrary proof. His determination is presumptively correct. Second, petitioner is missing an important step in its logic when stating that someone would pay costs of $ 6,000 for sales of $ 9,840 or $ 6,700 for sales of $ 12,000. The $ 6,000 and $ 6,700 represent the cost of Mrs. Cressman's labor. Petitioner presented no evidence regarding the cost of materials, other labor, transportation and other costs associated with the sale of "Amazing Deodorant." Petitioner's analysis is incomplete and unconvincing because of the deficiency in cost information.
The *378 Sixth Circuit (the court to which an appeal in this case would lie) in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, set forth a list of pertinent factors to be considered in deciding an issue of this type. [17]
* * * Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single *379 factor decisive. [Citations omitted.] While the evidence does not address all of these factors, the record reveals the following pertinent sales and salary figures for the indicated fiscal years: Fiscal year ended
Number of
Gross
Salary to
Apr. 30,
Bottles Sold
Slaes
Mrs. Cressman
1972
410 doz.
$ 9,840
$ 4,000
1973
500 doz.
12,000
6,000
1974
350 doz.
8,400
6,700
1976
*
*
1,800
The services performed by Mrs. Cressman were rudimentary and required only basic motor skills. Certainly the filling, capping and boxing of "Amazing Deodorant" were not unusual services requiring specialized knowledge and skills. Although it is undeniable that Mrs. Cressman performed these services during the corporation's 1972, 1973 and 1974 fiscal years, the record fails to disclose a reliable estimate of the amount of time that Mrs. Cressman devoted to the production of this product. Chattanooga Products has not proven that the amount of compensation paid to Mrs. Cressman was reasonable. However, we believe that the corporation is entitled to a larger deduction than that suggested by respondent. We note that Mrs. Cressman was the only employee of the corporation to perform such *380 services. Further, Mrs. Proctor testified that Mrs. Cressman would perform these services in response to the sales need of Chattanooga Products. We believe that, under the circumstances, a reasonable estimate of the value of the subject services can be determined by comparing the amount of salaries in cost of goods sold to gross sales during the years in issue. [18] Mrs. Cressman's services were those of a direct laborer. Consequently, compensation for such services would be reflected in cost of goods sold. Therefore, we consider the ratio of salaries in cost of goods sold to gross sales to be a reasonable basis for estimating the value of Mrs. Cressman's services. [19]
Using the information *381 from Chattanooga Products' tax returns for the years at issue, we find that the ratio of salaries and wages in cost of goods sold to gross sales ranged from 10 percent to 16 percent. Using the median of this range as a benchmark, we find the value of Mrs. Cressman's services to be as follows: Chattanooga Products'
Value of
Excess
Fiscal Year Ended Apr. 30,
Services
Payments
1973
$ 1,560 ($ 12,000 X 13%)
$ 4,440
1974 1,092 ($ 8,400 X 13%)
5,608
1976
0
1,800 Accordingly, such amounts are deductible as reasoable compensation paid by Chattanooga Products in the years indicated. [20] *382 Correspondingly, payments in excess of these calculated amounts are not in reality payments for services and cannot be regarded as "ordinary and necessary expenses" within the meaning of section 162(a). Turning to the constructive dividend question, respondent claims that the amounts paid to Mrs. Cressman in excess of reasonable compensation are taxable as dividends to the Proctors. We agree with respondent. * * * Where the payments are to kinsfolk or to shareholders, the proof must also show that they were not influenced by family considerations and were not disguised distributions of profits. See Botany Worsted Mills v. United States, 278 U.S. 282; Becker Bros. v. United States, 7 Fed. (2d) 3; United States v. Philadelphia Knitting Mills, 273 Fed. 657; Benz Bros. Co., 20 B.T.A. 1214; C.S. Ferry & Son, Inc., 18 B.T.A. 1261; Home Industry Iron Works, 8 B.T.A. 1267; Meyer Hecht, 2 B.T.A. 319; Gustafson Mfg. Co., 1 B.T.A. 508. [L. Schepp Co. v. Commissioner, 25 B.T.A. 419, 429 (1932).] The Proctors have failed to convince this Court that the amounts of unreasonble compensation "were not influenced by family considerations and were not disguised distributions of profits." Therefore, we hold that the Proctors received constructive dividends in the amount of $ 2,720.80 in 1972 and $ 4,440 in 1973 and that such amounts *383 are includable in their taxable income for those years. [21]
Issue 8. Accumulated Earnings Tax
We must next decide whether Chattanooga Products is liable for the accumulated earnings tax (AET) under section 531 for its fiscal years ended April 30, 1972, April 30, 1973 and April 30, 1974.
Section 531 imposes the AET on certain corporations formed or availed of for the purpose of avoiding income tax on its shareholders by permitting *384 earnings and profits to accumulate rather than being distributed. The AET was designed to compel such corporations to distribute dividends to shareholders rather than accumulate earnings in excess of its business needs. [22] Being in the nature of a penalty, the statutory provisions establishing this tax (sections 531-537) must be strictly construed. Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975). Application of section 531 thus depends upon the presence of two preconditions: (1) the intent to avoid tax at the shareholder level (proscribed purpose), Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 659-660 (1974), affd. 519 F.2d 1233 (1st Cir. 1975), and (2) accumulated taxable income as defined in section 535. To be sure, the existence of the proscribed purpose revolves around the state of mind of those shareholders who exercise control over the corporation's dividend policy. Ivan Allen Co. v. United States, supra at 628; *385 Golconda Mining Corp. v. Commissioner, 507 F.2d 594 (9th Cir. 1974), revg. on other grounds 58 T.C. 139, 158 (1972). The proscribed purpose need not be the dominant motive but simply must be a contributing factor in the decision to accumulate. United States v. Donruss Co., 393 U.S. 297, 307-309 (1969). However, if a corporation permits its earnings and profits to accumulate beyond its reasonble business needs, section 533(a) creates a rebuttable presumption that the proscribed purpose is present. Such presumption is determinative of the forbidden view unless the corporation can prove to the contrary by a preponderance of the evidence.
Accumulated taxable income (ATI), the second precondition, is the variable base for the AET computation under section 531. [23] *386 ATI is defined in section 535 as taxable income with certain adjustments. [24] *387 One such adjustment, the accumulated earnings credit (AEC) described in section 535(c), serves to reduce ATI to the extent that all or any part of a corporation's current earnings and profits are retained for its reasonble business needs. It follows that our examination of reasonable business needs is critical for two reasons: (1) to determine whether the proscribed purpose is presumed to exist under section 533(a), and (2) to calculate the amount of the AEC under section 535(c). If we determine *388 that accumulated earnings and profits were retained for reasonable business needs and therefore the section 533(a) presumption does not apply, then regardless of whether the control shareholders actually possessed the forbidden view the AET would not apply. This is so because the corporation would be entitled to an AEC equal to the amount of current earnings and profits retained, thereby resulting in zero ATI subject to the section 531 tax. Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 799 (1969); John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 474 (1965). With the aforementioned principles in mind we turn to a discussion of reasonable business needs. a. Reasonable Businesss Needs In resolving the question of whether a corporation has accumulated earnings and profits beyond its reasonble business needs, we look to the facts and conditions existing during the particular year of accumulation. Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 327 (1968); Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 582 (1965). Dixie, Inc. v. Commissioner, 31 T.C. 415, 426 (1958), affd. 277 F.2d 526 (2d Cir. 1960), cert. denied 364 U.S. 827 (1960). A corporation's directors *389 and officers generally bear the responsibility for determining the reasonable needs of the business. Consequently, we are reluctant to substitute our judgment of reasonable business needs for that of cororate management who are most familiar with the complexities and make-up of their corporation and its business. Faber Cement Block Co. v. Commissioner, supra at 329; Bremerton Sun Publishing Co. v. Commissioner, supra at 583. Nonetheless, as we have previously ruled, Chattanooga Products bears the burden of proving that current earnings and profits were accumulated for its reasonable business needs.
Section 537(a)(1) provides that reasonable business needs includes "reasoable anticipated needs of the business." Expounding of this statutory language, section 1.537-1(b), Income Tax Regs, provides as follows: § 1.537-1. Reasonable needs of the business. (b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of *390 such accumulation.Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.
(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxabel year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans *391 for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. [Emphasis added.] Although formal documentation would be to the taxpayer's benefit, it is not a prerequisite of satisfying the "specific, definite, and feasible" plan requirement of the regulations. John P. Scripps Newspapers v. Commissioner, supra at 469. This Court applies a practical standard; namely, whether the contemplated plan appears to have been a "real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." Smoot Sand & Gravel Corporation v. Commissioner, 274 F.2d 495, 499 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 362 U.S. 976 (1960).To comply with this standard, the "intention claimed must be manifested by some contemporaneous course of conduct directed *392 toward the claimed purpose." Smoot Sand & Gravel Corporation v. Commissioner, 241 F.2d 197, 202 (4th Cir. 1957), revg. a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957). In determining whether a current accumulation was reasonable, we focus on the accumulated earnings and profits reflected in net liquid assets, Ivan Allen Co. v. Commissioner, supra at 628, for "it is the nature of assets to which the accumulated earnings and profits are committed, rather than the mere monetary size of such accumulations, which controls." Faber Cement Block Co. v. Commissioner, supra at 328. Therefore, should Chattanooga Products' reasonable business needs exceed its year-end net liquid assets, then the corporation will not be liable for the AET in that year. However, if the opposite is true, the forbidden purpose is presumed to exist and the amount of reasonable business needs would enter into the computation of the AET, if imposed, through the application of the AEC. 1. Fiscal year ended April 30, 1972
Both parties agree that Chattanooga Products' net liquid assets at April 30, 1972 totaled $ 188,233.28. [25] Chattanooga Products' claimed justification for the accumulation of *393 earnings reflected in this pool of assets lies partially in its attempt to diversify into other business unrelated to the chemical business. In order for a new line of business to be considered a reasonably anticipated need, not only must there be a specific, definite and feasible plan of diversification but the proposed new line of business must also be an active trade or business. Atlantic Commerce & Shipping Co., Inc. v. Commissioner, 500 F.2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; sections 1.537-1(b), 1.537-2(c)(4) and 1.537-3(a), Income Tax Regs. Cf. section 1.355-1(c), Income Tax Regs. (regulations amplifying the "active trade or business) requirement of section 355(b)). The term "active trade or business" connotes activities of such a nature and character as to qualitatively distinguish its operation from a mere passive investment. [26] *394 Chattanooga Products contends that it needed to accumulate $ 218,922 to construct a skating rink, a part of its plan to diversify. In support of the existence of its diversification program, petitioner pointed out that it investigated the possibility of acquiring a Ford dealership prior to 1972. More specifically, in support of its claimed diversification into the real estate rental business, petitioner directs our attention to the fact that at different times during the years in issue Chattanooga Products leased certain real estate to a tenant; operated the Brainerd Motel; and constructed and assisted in the operation of the subject skating rink which was leased to Fort-Lake. Chattanooga Products reasons that its activities in connection with the skating rink were part of an active real estate rental business. Because the funds expended to construct the skating rink allegedly were reasonably anticipated as of April 30, 1972, Chattanooga Roducts concludes that it was justified in accumulating $ 188,233.28 in net liquid assets as of that date. Respondent's principal contention is that the skating rink, as well as the other "investments," involved no *395 management activities and were therefore passive investments rather than active business. Consequently, respondent asserts that Chattanooga Products could not accumulate earnings to fund the construction of the skating rink because it was not a reasonable business need. We first consider whether Chattanooga Products had specific, definite and feasible plans as of April 30, 1972 to accumulate earnings for the development of the skating rink. We may use hindsight as an aid in resolving this question for a definite plan may be inferred where subsequent events add flesh to the bare bones of petitioner's contentions. See Faber Cement Block Co. v. Commissioner, supra at 333; Dixie, Inc. v. Commissioner, supra at 430; section 1.537-1(b)(2), Income Tax Regs.
Despite the lack of formal records evidencing the plan, we note that Chattanooga Products undertook clear action in furtherance of its expressed intention to diversify its business. Prior to the development of the skating rink, Chattanooga Products investigated the possibility of acquiring a Ford dealership. Despite obtaining Ford's approval and going so far as to sell a piece of land to raise capital for the purchase, negotiations *396 hit an impasse and were abandoned. Although these efforts were thwarted, Chattanooga Products succeeded in acquiring and leasing certain real estate consisting of land, an office building and a garage, and acquiring and operating the Brainerd Motel (which was sold in September 1972). Surely these activities add credence to the corporation's diversification claims as of April 30, 1972.
Moving forward to the heart of this controversy, we find that Chattanooga Products' expressed intentions to diversify were again concretely evidenced in May 1972 when the corporation acquired the skating rink site. Shortly thereafter construction began and within just over a year the skating rink was completed and operational. The corporation expended $ 219,006.95 and $ 29,496.03 in its fiscal years ended April 30, 1973 and April 30, 1974, respectively, toward the completion of the skating rink, which was leased to Fort-Lake.
We reiterate that this and other courts take a practical view of the "specific, definite, and feasible" plan requirement of the regulations where closely-held corporations are involved. [27] With this principle in mind, and looking to the corporation's course of conduct with respect *397 to the skating rink coupled with its other activities directed toward expansion and diversification, we find that Chattanooga Products had a "specific, definite, and feasible" expansion plan for the development of the skating rink as of April 30, 1972.Therefore, we turn to the more difficult factual determination of whether Chattanooga Products' activities in this regard comprised a second active trade or business. If Chattanooga Products' real estate rental activities constitute a second active trade or business in addition to the existing chemical business, then its expansion plans with regard to the skating rink would justify its accumulation of earnings in the form of net liquid assets for the year under consideration. See Sandy Estate Co. v. Commissioner, 43 T.C. 361, 375-377 (1964). *398 However, if the corporation's real estate ventures represent passive investments, then its plans would not be a legitimate ground for the accumulation of earnings. See section 1.537-2(c)(4), Income Tax Regs.; Atlantic Commerce & Shipping Co., Inc. v. Commissioner, supra at 940; J. Gordon Turnbull, Inc. v. Commissioner, 41 T.C. 358, 377 (1963), affd. 373 F.2d 87 (5th Cir. 1967), cert. denied 389 U.S. 842 (1967); Raymond I. Smith, Inc. v. Commissioner, 33 T.C. 141, 153-155 (1959), affd. 292 F.2d 470 (9th Cir. 1961), cert. denied 368 U.S. 948 (1961). There is no mystical formula for determining whether an "active trade or business" did or did not exist. Resolution of this question depends upon a balancing of facts and circumstances. Some years ago, in the context of determining net operating loss carrybacks, this Court found, with little inquiry into the lessor/taxpayer's renting and management activity, that the renting out of a single piece of residential rental real estate may amount to the operation of an active trade or business. Lagreide v. Commissioner, 23 T.C. 508, 511-512 (1954). See also Elliott v. Commissioner, 32 T.C. 283, 289-290 (1959); Hazard v. Commissioner, 7 T.C. 372, 374-375 (1946). *399 Although Lagreide is not controlling precedent, it certainly is analogous and also demonstrates the latitude afforded the trier of fact in making this type of determination. In any event, the ultimate question to be resolved is whether considering all the facts and circumstances, the skating rink was part of a business qualitatively distinguishable from a passive investment. Some of the relevant factors gleaned from case authority which bear on this question include (1) whether the amount of the rental payments was inconsequential or trivial, (2) whether a single property or multiple properties were rented and whether operational and management activities were undertaken in connection with the rental properties, (3) whether separate books were maintained for the rental activities, (4) whether there was evidence of the purpose for acquiring the rental proprty, (5) whether the lessor constructed, improved or rehabilitated the rental property, and (6) whether there was evidence that the taxpayer had the capability of managing a new line of business. [28] *400 With respect to the first factor, at different times during the years in issue, Chattanooga Products received rental payments for the skating rink of approximately $ 2,500 per month from Fort-Lake and received an additional $ 300 per month in connection with the rental of another property. Further, Chattanooga Products presumably received gross rental income through the operation of the motel although the amount is not disclosed in the record. Suffice it to say that we do not consider these rental payments to be inconsequential or trivial. In response to the second factor, the facts show that Chattanooga Products acted as general contractor for the construction of the skating rink.While such activity *401 is not conclusive, it is a significant indication of independent business activity. See Rafferty v. Commissioner, 55 T.C. 490, 499 (1970), affd. 452 F.2d 767 (1st Cir. 1971), cert. denied 408 U.S. 922 (1972). Once the skating rink was completed and operational (early 1974), Chattanooga Products leased the rink to Fort-Lake. Although the record does not delineate the rights and duties of the parties to the lease, we do know that Chattanooga Products actually performed certain services in connection with the operation and management of the skating rink. During the day when the skating rink was closed, the corporation answered telephone inquiries and booked skating parties. These activities were performed in connection with the lessor/lessee relationship and contributed to the success of the skating rink. Further, Chattanooga Products maintained the financial records for Fort-Lake. These activities alone appear to cast the skating rink in a posture qualitatively distinguishable from a passive investment such as a marketable security or a government obligation. Moreover, the skating rink was not the only real estate activity of Chattanooga Products during the 1972 taxable year. During *402 the taxable year in issue, Chattanooga Products operated and managed a motel. Clearly this operation was a venture requiring active participation by Chattanooga Products' employees. In addition, during at least part of the year in issue, Chattanooga Products rented out real estate consisting of land, an office building and a garage. While it is apparent from the written lease that Chattanooga Products contracted for a passive role with regard to this latter property, this lease must not be viewed in a vacuum. It must be weighed in light of the corporation's other real estate ventures. We believe that Chattanooga Products' real estate activities taken as a whole were not the modusoperandi of a passive inventor. The evidence does not show whether separate books or records were maintained for the income and expenses associated with the Chattanooga Products rental activities (third factor). However, we do know that Chattanooga Products separately maintained Fort-Lakes's financial records. We have previously discussed Chattanooga Products' expressed purpose for acquiring and constructing the skating rink (fourth factor); that is, to diversify into another business. Certainly, Proctor's *403 testimony in this regard is self-serving. Nonetheless, this testimony is also consistent with his corporation's other real estate activities. Also favorable to the taxpayer's cause is the fact that it acted in the capacity of general contractor during the construction of the skating rink (fifth factor). Moreover, we note that Chattanooga Products showed an ability to proceed with a real estate rental business (sixth factor) by operating the Brainerd Motel and also demonstrated a willingness to proceed with a second business by its attempts to acquire a Ford dealership. On balance, a consideration of all of these factors weighs in favor of Chattanooga Products. In addition, we reiterate the principle that the provisions applying the AET must be strictly construed due to their punitive nature. Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975). Therefore, based on the foregoing and a careful consideration of the entire record, we hold that Chattanooga Products' activities in connection with the skating rink were part of an active trade or business. Consequently, it follows that the skating rink was a reasonably anticipated need of the business as of April 30, 1972 and the *404 corporation was justified in accumulating earnings in the form of net liquid assets for this purpose. Because a reasonable accumulation for the skating rink (approximately $ 218,922) exceeds net liquid assets as of April 30, 1972 ($ 188,233.28) we hold that Chattanooga Products is not liable for the accumulated earnings tax for that year. Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 799 (1969). 2. Fiscal year ended April 30, 1973
Respondent contends that Chattanooga Products' net liquid assets as of April 30, 1973 totaled $ 83,430.02. [29] Chattanooga Products takes issue with this figure because it includes the total amount of loans receivable from Fort-Lake ($ 20,000) instead of what petitioner claims to be the current portion of such receivable ($ 5,583). Thus, Chattanooga Products claims that its net liquid assets amounted to $ 69,013. We repeat that petitioner has the burden of proof with respect to this controversy. Chattanooga Products attempts to satisfy this burden by relying totally on a page from its general ledger *405 which allegedly reflected monthly payments actually received in satisfaction of a portion of Fort-Lake's indebtedness. We are simply not persuaded by this evidence. We are not convinced that this receivable should be excluded from net liquid assets. The record is unclear with respect to whether this receivable was payable on demand and therefore a potential source for dividend distributions. Proctor did not testify with respect to the nature or terms of this receivable and we will not speculate in that regard. Therefore, we hold that Chattanooga Products had net liquid assets as of April 30, 1973 totaling $ 83,430.02.
We now shift our attention to a consideration of Chattanooga Products' alleged reasonable business needs. The corporation contends that it had to accumulate earnings of $ 29,053 as of April 30, 1973 to complete construction of and to acquire equipment for the skating rink. We note that Chattanooga Products spent $ 29,496.03 in the following fiscal year (April 30, 1974) in furtherance of this expressed need. Based on this fact and our previous discussion about the skating rink (set forth in the preceding section of this opinion) we find that the funds for the skating *406 rink were accumulated for reasonable business needs and that Chattanooga Products was justified in accumulating earnings of $ 29,053 in the form of net liquid assets as of April 30, 1973 to complete this project.
The regulations provide that a corporation may accumulate earnings "to provide necessary working capital for the business * * *." Section 1.537-2(b)(4), Income Tax Regs. Both parties agree with the concept but disagree with respect to the amount. Chattanooga Products claims that it is entitled to accumulate earnings of $ 96,623 for working capital needs while respondent contends that only $ 53,882.01 need be accumulated for this purpose. Without reaching the merits of either party's claim, we note that by using respondent's estimate, Chattanooga Products would be justified in accumulating earnings in the form of net liquid assets for the subject year of $ 82,935.01 ($ 53,882.01 plus $ 29,053 for the skating rink). Therefore, without proceeding any further, Chattanooga Products has justified all but $ 495.01 ($ 83,430.02 less $ 82,935.01) of its accumulated earnings committed to net liquid assets. Section 1.537-1(a), Income Tax Regs., provides that in determining whether *407 earnings have been accumulated beyond the reasonable needs of the business, we look to see whether " a prudent businessman" would consider such accumulation to be appropriate for present and anticipated needs of the business. In the instant case, we believe that the additional accumulation of $ 495.01 was not imprudent. Accordingly, we find that for the fiscal year ended April 30, 1973 Chattanooga Products had not accumulated earnings in excess of its reasonable business needs and therefore, is not liable for the accumulated earnings tax for such year. 3. Fiscal year ended April 30, 1974
Petitioner and respondent again are at odds with respect to the amount of Chattanooga Products' net liquid assets as of April 30, 1974; petitioner claims that $ 141,182 is the proper amount while respondent asserts a $ 147,965.93 [30] figure. The resolution of this difference is unnecessary for as we shall see, Chattanooga Products, in either case, has retained net liquid assets in excess of its reasonable business needs. A summary of *408 Chattanooga Products' alleged reasonable business needs as of April 30, 1974 is as follows: Working Capital
$ 118,222
Additions to Machinery and
Equipment
3,463
Additions to Corporate Plant
and Office Building
18,810
Anticipated Deficiency in
Depreciation Reserve to Provide
for Building, Office, Plant and
Equipment Replacements
15,700
Reserve for Corporate Plant and
Office Building Expansion
78,030
$ 234,225
Chattanooga Products may accumulate earnings to meet operating expenses for a single operating cycle (working capital needs).[31] *409 Doug-Long, Inc. v. Commissioner, 72 T.C. 158, 176 (1979), supplemental opinion 73 T.C. 71 (1979), on appeal (2d Cir. Jan. 11, 1980); Magic Mart, Inc. v. Commissioner, 51 T.C. at 791-793. Both parties utilized the so-called Bardahl[32] formula in calculating Chattanooga Products' working capital needs.[33] Although the Bardahl formula is a well-established tool routinely applied by the courts, this formula should not be applied rigidly for it is only a rule of thumb--a tool of administrative convenience which is meant to estimate the working capital needs of a business. See, e.g., Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 599 (1972). [34] Unfortunately, the parties disagree on some of the mechanics of the Bardahl formula. The proposed Bardahl computation of each party is as follows: Petitioner
Respondent
A. Length of the Operating Cycle
1) Inventory Cycle
a) Cost of Goods Sold per Return
$ 180,214.00 $ 180,214.04
b) Conceded Adjustments
(34,791.00)
c) Cost of Goods Sold as Adjusted
$ 145,423.00 $ 180,214.04
d) Average Inventory per Return
$ 11,571.00 $ 11,570.82
e) One-half of Conceded Inventory
Adjustments
5,812.00 f) Average Inventory as Adjusted
$ 17,383.00 $ 11,570.82
g) Inventory Cycle Expressed as
Percentage of Year (line if
divided by line 1c)
.1195
.0642
2) Accounts Receivable Cycle
a) Net Sales per Return
$ 541,143.00 $ 541,142.63
b) Conceded Adjustments
8,980.00 c) Net Sales as Adjusted
$ 550,123.00 $ 541,142.63
d) Year-end Accounts Receivable
$ 60,225.00 $ 48,574.89
e) Accounts Receivable Cycle
Expressed as Percentage of
Year (line 2d divided by line
2c)
.1095 .0897
3) Operating Cycle Expressed as
Percentage of Year (line 1g
plus line 2e)
.2290 .1539
B. Operating Cycle Cost
1) Operating Expenses for Full Year
Including Cost of Goods Sold$'$ 475,625.00 $ 413,787.49
2) Less Depreciation Included in line
B1
31,763.00 $ 20,228.16
3) Plus: Federal Income Tax
72,390.00 15,000.00
4) Operating Expenses
$ 516,252.00 $ 408,559.33
5) Operating Cycle Percentage
(line A3)
.2290 .1539
6) Amount of Working Capital Needs
$ 118,220.00 $ 62,877.28
*410 At the outset, petitioner contends that we should take into consideration in the Bardahl computation the effects of certain concessions made by the parties with respect to items brought into issue by respondent's notice of deficiency. We disagree.
In determining reasonable business needs, we look to the conditions existing in the year of accumulation. Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. at 582. Our inquiry must focus on what a prudent businessman would anticipate to be a reasonable accumulation of earnings for working capital needs based on facts at the close of the taxable year. Section 1.537-1(a) and (b), Income Tax Regs.The Bardahl formula is a device used to estimate what a prudent businessman would consider to be reasonably anticipated working capital needs for one operating cycle of his business. Generally, a prudent businessman would use year-end financial statement figures as a starting point for estimating future operating costs. In the present case, the financial statement figures stipulated to by the parties correspond to the amounts shown on Chattanooga Products' tax return. The petitioner has not presented any reason to modify these reported figures *411 by the conceded items. We believe it inappropriate to inject concessions that Chattanooga Products could not reasonably have anticipated as of April 30, 1974 into our determination of working capital needs. [35] Accordingly, conceded adjustments shall be excluded from our Bardahl computation. In a second dispute over the application of the Bardahl formula, respondent argues that receivables from R & D should not be included in the calculation of the accounts receivable cycle because "Chattanooga Products failed to show that collection from R & D required time and should therefore be included." We cannot agree with respondent. Chattanooga Products sold chemicals to R & D in the ordinary course of business. The accounts receivable resulting from such sales were therefore related to and generated by the business operations of Chattanooga Products.The credit arrangements with R & D apparently were *412 the same as were available to other customers of Chattanooga Products.Thus, the R & D receivable was no different than other trade receivables, albeit involving a related entity. Accordingly, this receivable shall be included in our Bardahl calculation. [36]
Chattanooga Products maintains that it is entitled to use the operating expenses and cost of goods sold from its fiscal year ended April 30, 1975 in determining necessary working capital. Respondent claims that Chattanooga Products has not proven that the use of subsequent years' figures is justified in the instant case. We reiterate that the Bardahl formula is used to estimate reasonably anticipated working capital needs for one operating cycle. Under the circumstances, we consider petitioner's use of subsequent years' figures to be justified because such amounts appear to be a reasonable barometer of what a prudent businessman would *413 anticipate to be appropriate in estimating future working capital needs. [37] Therefore, subsequent years' figures shall be used in our Bardahl computation.
The final controversy over the mechanics of the Bardahl formula concerns the amount of income taxes to be included as a component of the working capital computation. Respondent maintains that only estimated Federal income taxes paid by Chattanooga Products during its 1974 fiscal year ($ 15,000) should be included in the computation. Chattanooga Products, on the other hand, contends that the corporation's Federal income tax liability for its fiscal year ended April 30, 1974 ($ 72,390) is the proper amount.
Federal income taxes are part of the costs connected with the operation of a business. Corporations are required to pay estimated Federal income taxes at certain intervals during its tax year. Section 6154. This Court has allowed current estimated tax payments to be included as part of operating expenses in the Bardahl formula. [38] Similarly, we believe that it is appropriate in the present case to include *414 as part of operating costs the amount of Federal income taxes that Chattanooga Products could reasonably have anticipated paying during its fiscal year ended April 30, 1975 based on facts existing at the close of the fiscal year at issue herein. Chattanooga Products' Federal income tax liability for each of the years indicated below was as follows: Fiscal year ended
Federal income
Apr. 30
tax liability
1972
$ 48,505.77
1973
66,884.18
1974
72,390.27
Relying on these amounts, a reasonable businessman would be justified in concluding that his corporation's estimated Federal income tax for the 1975 fiscal year might equal or exceed the prior year's liability. Accordingly, we find for petitioner on this question. Therefore, the amount used by Chattanooga Products for Federal income taxes shall be appropriately reflected *415 in our Bardahl computation. Based on the foregoing, we hold that Chattanooga Products' reasonably anticipated working capital needs as of April 30, 1974 were as follows: A. Length of the Operating Cycle
1) Inventory cycle
a) Cost of Goods Sold
$ 180,214.00
b) Average Inventory
11,571.00
c) Inventory Cycle Expressed
as Percentage of Year
(line 1b divided by line
1a)
.0642
2) Accounts Receivable Cycle
a) Net Sales
$ 541,143.00
b) Year-end Accounts Receivable
60,225.00
c) Accounts Receivable Cycle
Expressed as Percentage of
Year (line 2b divided by
line 2a)
.1113
3) Operating Cycle Expressed as
Percentage of Year (line 1c
plus line 2c)
.1755
B. Operating Cycle Cost
1) Operating Expenses for Full Year
$ 475,625.00
2) Less Depreciation Included in
line B1
31,763.00
3) Plus: Federal Income Tax
72,390.00
4) Operating Expenses
$ 516,252.00
5) Operating Cycle Percentage
(line A3)
.1755
6) Amount of Working Capital Needs
$ 90,602.00 In addition to working capital needs, Chattanooga Products asserted four other reasonable business needs to justify its accumulations. The corporation alleged a reasonable business need of $ 3,463 for additions to machinery and equipment and $ 18,810 for additions to its corporate plant and office building. *416 These amounts represent amounts spent for the additions to machinery and equipment and for additions to the corporate plant and office building during the fiscal year immediately following the fiscal year under consideration. Section 1.537-2(b)(1), Income Tax Regs., lists the "bona fide expansion of business or replacement of plant" as a reasonable ground for the accumulation of earnings. However, in order to justify accumulations for this purpose, the corporation must have "specific, definite and feasible plans for the use of such accumulation." Section 1.537-1(b)(1), Income Tax Regs.
Chattanooga Products' position is that "the amount of capital expenditure for each year would have been reasonably anticipated in the immediately preceding period." This position totally ignores the fact that Chattanooga Products has the burden of establishing a "specific, definite, and feasible" plan. Although subsequent events are of some assistance in determining the existence of a plan at the close of a given tax year, they are by no means conclusive. The only other evidence offered by petitioner to establish a plan was Proctor's vague and general testimony concerning his desire to expand Chattanooga *417 Products' chemical business. In fact, Proctor never specifically addressed the subject grounds for accumulation in his testimony.
Vague and uncertain testimony is not adequate to prove that the appropriate plans existed. Section 1.537-1(b)(2), Income Tax Regs. We simply are unpersuaded by Proctor's testimony and hold that Chattanooga Products has not met its burden of establishing that such expenditures were anticipated during the year involved. [39] Therefore, Chattanooga Products is not justified in accumulating earnings for these reasons. The next alleged reasonable business need relates to an anticipated deficiency in the "depreciation reserve" of $ 15,700 due to increased costs of replacing plant and equipment. First of all, petitioner has not submitted any evidence showing that the depreciation reserve was inadequate. Second, there is no evidence in *418 the record that Chattanooga Products retained earnings in anticipation of a deficiency in the depreciation reserve, if one actually existed. In addition, the record fails to establish the existence of any plans for future replacement of plant and equipment or that any actual expenditures for replacements subsequently occurred. Therefore, this asserted ground cannot justify an accumulation of earnings. The last asserted business need, the reserve for corporate plant and office building expansion in the amount of $ 78,030, involves expenditures not begun until February 1977 and not completed until January 1978. There is no indication anywhere in the record that such expansion was contemplated by Chattanooga Products in its 1974 fiscal year. Consequently, Chattanooga Products again has failed to sustain its burden of proof with respect to this asserted need. [40] *419 Section 534(a) directs that we presume Chattanooga Products was availed of for the purpose of avoiding income tax with respect to its shareholders because the corporation has failed to justify its full accumulation of earnings in terms of net liquid assets. Accordingly, Chattanooga Products shall be held liable for the AET unless it can prove by a preponderance of the evidence that the forbidden purpose did not contribute to the controlling shareholder's (Proctor's) decision to accumulate. United States v. Donruss, 393 U.S. 297, 307-309 (1969); Ivan Allen Co. v. United States, 422 U.S. at 628. Proctor claims that he did not have the requisite knowledge of the tax law to formulate the proscribed purpose. Respondent, basing his determination on an analysis of objective factors set out in the egulations, maintains that the proscribed purpose *420 was a contributing factor in Proctor's decision to accumulate earnings. Section 1.533-1(a)(2) of the regulations provides three indicia of the proscribed purpose-- § 1.533-1 Evidence of purpose to avoid income tax. (a) In general. * * * (i) Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit of the shareholders, (ii) The investment by the corporation of undistributed earnings in assets having no reasonable connection with the business of the corporation (see § 1.537-3), and (iii) The extent to which the corporation has distributed its earnings and profits.* * * In this case, indicia (i) and (iii) of the proscribed purpose are present. The corporation loaned large sums of money to Proctor and to two related corporations, Jepco and Fort-Lake. Chattanooga Products also paid personal expenses of the Proctors (e.g. , automobile expenses - Issue 6) and expended funds for the personal benefit of the Proctors (e.g., gift of Corvette - Issue 5(a); insurance premiums-Issue 5(b); payments to Irene Cressman - Issue 7). Such uses of corporate funds for the Proctors' *421 personal benefit indicate the existence of the forbidden purpose. In addition, Chattanooga Products has never declared and paid dividends to its shareholders.A poor dividend history strongly evidences the presence of the proscribed purpose. Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. at 588. Any dividends paid to the Proctors would have been subject to individual Federal income tax rates of at least 60 percent while the corporation was subject only to the maximum corporate tax rate of 48 percent. Proctor avoided a double tax on corporate distributions as well as the higher individual income tax rate by retaining earnings in the corporation. Notwithstanding the foregoing, Proctor contended that he did not intend to use the corporation for the forbidden purpose. Proctor claimed that he was unsophisticated in financial and tax matters. he insisted that his only concern was the financial security and growth of his companies, and that the tax consequences of corporate accumulations played no role in his decision making. However, we are unimpressed with Proctor's arguments. Proctor testified that he was leary of professional advice, and preferred to rely on his own judgment *422 rather than that of an attorney or accountant. For the fiscal years ended April 30, 1972 and April 30, 1973, Proctor elected to have R & D taxed as a small business corporation (subchapter S). As understanding of the tax implications of such an election requires knowledge of the interrelationship between the taxation of corporations and shareholders. Proctor would have us believe that he elected subchapter S status without understanding any of the tax ramifications of such an election. [41]
We are unwilling to accept such a contention. It is indisputable that Proctor was an astute businessman with a keen knowledge of the chemical business. While Proctor may have had a feeling of antipathy toward consulting attorneys or accountants, we find it hard to believe that Proctor would make an election of subchapter S status without any professional guidance and without understanding the implications of his election. At a different point in his testimony, Proctor alleged that he was unaware that *423 increased income taxes were a logical consequence of reporting additional income. We again find this testimony to be unbelievable. In accordance with the above, we reject Proctor's assertion that he lacked the requisite knowledge to formulate the proscribed purpose. We have found previously that Chattanooga Products had allowed its earnings and profits to accumulate beyond its reasonable business needs, thereby creating a statutory presumption of the existence of the proscribed purpose. The Supreme Court has stated that the proscribed purpose need only be a contributing factor in the decision to accumulate. United States v. Donruss, supra.Thus, to overcome this presumption, Proctor would have to prove by a preponderance of evidence that such purpose was not a contributing factor. This question of purpose necessarily focuses on the state of mind of Proctor. However, without credible testimony from Proctor with respect to his state of mind, Chattanooga Products is left only with objective factors to overcome this presumption -- a difficult task indeed. Instead of assisting petitioner, an analysis of the objective factors set forth in the regulations favors a finding that the *424 proscribed purpose was present. Accordingly, we must reject Chattanooga Products contentions and hold that the corporation has failed to overcome the presumption in favor of respondent. Therefore, we hold that Chattanooga Products is liable for the accumulated earnings tax for its fiscal year ended April 30, 1974. The parties have one final disagreement: the amount of the dividends paid deduction to be used in the calculation of the AET. Section 535(a) provides that taxable income shall be reduced by the amount of dividends paid during the taxable year (dividends paid deduction) to arrive at ATI. See section 561. However, constructive dividends shall not be considered dividends for the purpose of calculating such deduction unless they are pro rata with no preference to any particular share of stock. Section 562(c). Respondent claims that all of the constructive dividends were preferential and not pro rata. Therefore, he determined that Chattanooga Products is not entitled to a dividends paid deduction. Petitioner claims that the dividends were pro rata because the corporation was owned jointly by the Proctors who filed joint Federal income tax returns. The corporation was *425 solely owned by the Proctors with Proctor owning 50 percent of the stock and Mrs. Proctor owning the remaining 50 percent. To the extent that dividends were constructively received solely by Proctor and not by Mrs. Proctor, such dividends are not pro rata, but are preferential, and are not included as part of the dividends paid deduction. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 747-748 (1973). The record discloses four items in controversy with respect to the dividends paid deduction: (1) payments to Irene Cressman, (2) insurance premiums for Warren E. Cressman, (3) personal automobile expenses of the Proctors, and (4) travel, entertainment and promotional expenses. We find that any dividends associated with payments to Irene Cressman were pro rata and therefore includable in the dividends paid deduction. We believe that these payments reflected benefits to both of the Proctors as a family unit. Proctor had a vested interest in the welfare of his mother-in-law by virtue of his marital relationship; Mrs. Proctor by virtue of her blood relationship. Based upon our previous discussion of these payments (Issue 7), we find that the dividend attributable to this item *426 and includable in the computation of the dividends paid deduction equals $ 5,608. [42] The insurance premium of $ 523.44 paid in 1974 by Chattanooga Products for the benefit of Warren Cressman was also a pro-rata constructive dividend includable in the dividends paid deduction. (See discussion under Issue 5(b).) Proctor had business dealings with Warren Cressman, has brother-in-law. Certainly these payments *427 were helpful in this business relationship as well as his marital relationship. Further, Warren Cressman was Mrs. Proctor's brother. Therefore, these payments were also for Mrs. Proctor's benefit. Accordingly, we hold that Chattanooga Products is entitled to a dividends paid deduction of $ 523.44 with respect to this item. A different result is required with respect to the disallowance of automobile expenses related to each of the Proctor's personal use of automobiles. The Proctors each used a corporate automobile for business and personal use. The amount that each automobile was used personally by each of the Proctors can be readily identified. Since the benefit of each automobile inured to each of the Proctors separately, the dividends associated with this personal use was preferential within the plain meaning of section 562(c). With respect to the fourth item, Chattanooga Products conceded that it was not entitled to a deduction for travel, entertainment and promotional expenses in the amount of $ 7,241.03 for the corporation's 1974 fiscal year. There is no evidence in the record of the nature of these disallowed expenses. Petitioner has failed to satisfy its burden of *428 proof with respect to this item. Therefore, no dividends paid deduction shall be allowed in this regard. Issue 9. Depreciation Expense--R & D
It was the practice for R & D to install its spray washer equipment on the premises of customers in order to encourage the purchase of R & D's cleaning compounds. The equipment as issue was installed subject to a conditional sales contract. We must decide whether R & D is entitled to deductions for depreciation under section 167 as reported on its April 30, 1975, April 30, 1976 and April 30, 1977 fiscal year Federal tax returns. Also, we must decide whether R & D is entitled to an investment tax credit under section 38 as reported on its April 30, 1975 fiscal year tax return in connection with certain equipment subject to conditional sales contracts.
The taxpayer who bears the economic loss of invested capital resulting from the exhaustion, wear and tear of business property is entitled to the depreciation deduction. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 254 (1939); Weiss v. Wiener, 279 U.S. 333, 335-336 (1929). Where a taxpayer recovers his investment through a sale, he no longer has a depreciable capital investment and is *429 not entitled to a depreciation deduction. Helvering v. F. & R. Lazarus & Co., supra at 254. Moreover, property with respect to which depreciation is not allowable does not qualify for the investment tax credit. Sections 38 and 48(a).
The term "sale" is given its common and ordinary meaning for Federal income tax purposes; that is, a transfer of property for money or its equivalent that the buyer pays or promises to pay to the seller. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965).The questions of whether and when a sale occurs are essentially ones of fact to be resolved by considering all the surrounding circumstances in order to determine if the benefits and burdens of ownership have shifted. Baird v. Commissioner, 68 T.C. 115, 124 (1977); Deyoe v. Commissioner, 66 T.C. 904, 910 (1976). In its fiscal year ended April 30, 1975, R & D acquired or built spray washer equipment. In that same year, the corporation placed such equipment on customer locations pursuant to conditional sales contracts. R & D does not argue seriously that it is entitled to depreciation on the equipment subject to the conditional sales contracts, and for good reason. Although R & D retained title to *430 the equipment under the contracts, this fact standing alone is not determinative. Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978); Dettmers v. Commissioner, 430 F.2d 1019, 1023 (6th Cir. 1970), affd. Estate of Johnston v. Commissioner, 51 T.C. 290 (1968). Pursuant to the conditional sales contract, the purchaser acquired possession and use of the equipment from R & D. Under the contract, the purchaser and required to maintain and insure the equipment, pay all taxes and charges imposed on such equipment and bear the risk of loss or destruction of such equipment. In sum, the benefits and burdens of ownership were shifted from R & D to the purchaser when the contract was operative. Based on the foregoing and the fact that the transactions were structured in the form of a sale, we find that R & D sold the subject equipment pursuant to the conditional sales contracts in its fiscal year ended April 30, 1975. Accordingly, we hold that R & D is not entitled to the claimed depreciation deductions and investment tax credit on such equipment.
Nonetheless, R & D claims that it must be entitled to recover its cost in the equipment in some other manner, if not through depreciation *431 deductions. Respondent, however, argues that R & D recovered its costs by charging them to expense in the year of sale. Although the record is confused and incomplete, it appears that R & D has not recovered at least a portion of its costs associated with this equipment. Generally, such costs are recovered in the year of sale when gain or loss is recognized in an amount equal to the difference between the amount realized by the seller and his basis (cost). Sections 1001, 1011 and 1012. However, because the trial record is so deficient and incomplete with respect to this issue, we are unable to determine the proper amount of gain or loss realized or the proper timing for recognition of such gain or loss. Even so, we believe that in all good conscience respondent should allow R & D to recover, in some manner, its unrecovered costs, the details of which hopefully can be resolved and embodied in a Rule 155 computation. Rule 155, Tax Court Rules of Practice and Procedure.
Issue 10. Allocation of Purchase Price--R & D
The issue for decision here is whether part of the price that R & D paid to acquire Atco's spray washer business is allocable to intangible assets as determined by *432 respondent. R & D allocated the full amount of the $ 60,000 purchase price to depreciable equipment and parts inventory: Equipment: 51 High-pressure washers
$ 46,000
2 Drive-through systems
7,000
Inventory: Parts
7,000
Total
$ 60,000
In support of this allocation, R & D theorizes that it could not have paid for goodwill because it did not purchase the Atco name and Atco's business was in a deteriorated state when purchased. Moreover, R & D claims that the value of the tangible assets was greater than the purchase price, that the main reason for entering into the Agreement was to acquire the equipment and their allocation properly reflected the intent of the parties to the Agreement and the value of each asset purchased. Respondent parries by insisting that the value of the tangible assets is substantially less than that proposed by R & D: Equipment
51 High-pressure washers
$ 15,300
2 Drive-through systems
1,400
Covenant not to compete
12,000
Goodwill
31,300
Total
$ 60,000
Respondent asserts that in this case the most reliable evidence of the value of the equipment is the amount realized upon resale of three of the washers ($ 300 per washer). The difference between the value so placed on the equipment *433 and the total purchase price was determined to be the value of the intangible assets (covenant not to compete and goodwill).R & D has the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. See also Estate of Gannon v. Commissioner, 21 T.C. 1073, 1083 (1954). We first turn to the question of whether R & D purchased intangible assets such as goodwill. If we answer this question in the affirmative, our attention must shift to the value of these intangible assets in order to make a proper allocation of the total purchase price among the various assets acquired. Copperhead Coal Company v. Commissioner, 272 F.2d 45, 48 (6th Cir. 1959), affg. a Memorandum Opinion of this Court. The resolution of these questions is not attained pursuant to a rigid formula but is dependent on the facts of each particular case. Schulz Baking Co. v. Commissioner, 3 B.T.A. 470, 473 (1926). Over a half century ago, Judge Cardozo described goodwill as follows: The books abound in definitions of good will. * * * There is no occasion to repeat them. Men will pay for any privilege that gives a reasonable expectancy of preference in the race *434 of competition. * * * Such expectancy may come from succession in place or name or otherwise to a business that has won the favor [of] its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty; at the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case. (Cits. omitted.) [In Re Brown, 242 N.Y. 1, 150 N.E. 581, 582 (1926).] More recently, this Court has stated that goodwill exists where a business has the potential to realize earnings in excess of what might be considered a normal return on its investment in the tangible assets. VGS Corp. v. Commissioner, 68 T.C. 563, 590 (1977); Philadelphia Steel and Iron Corp. v. Commissioner, 344 F.2d 964 (3d Cir. 1965), affg. per curiam a Memorandum Opinion of this Court. This potential may arise as a result of some competitive advantage or the prospect of continued patronage of customers. Wilmot Fleming Engineering Co. v. Commissioner, 65 T.C. 847, 861 (1976), Miller v. Commissioner, 56 T.C. 636, 648-649 (1971). We need *435 only to look at the Agreement to discover that R & D acquired more than just tangible assets. The Agreement sets forth a list of 43 customers and the Atco equipment located on each customer's premises. The Agreement provided in Article 1 that an Atco representative would go with an R & D representative to 21 designated customers "a minimum of three times in order to expedite transition of the account." Atco also was obligated to use its best efforts to assist R & D in all customer relations. Therefore, it is apparent that R & D acquired not only equipment but also the competitive advantage of having the equipment at customer locations. R & D also acquired Atco's promise to help retain these customers. Some of the testimony and surrounding circumstances also support our impressions drawn from the language of the Agreement. Prior to the subject purchase, R & D was in the business of selling chemical cleaning compounds. As part of this business, it maintained spray washer equipment at customer locations and sold cleaning compounds to these customers. R & D anticipated doing the same with Atco customers. Proctor and Paul Kreitner, an R & D employee, testified that the chemical business *436 was extremely competitive. This being the case, new customers were hard to develop. Certainly, R & D acquired an advantage by having the Atco equipment already in place at 43 established locations.
We do not consider it significant that R & D did not acquire the Atco name. Clearly, the Atco name was not valuable to R & D because of the deteriorated state of that business. However, it is equally clear that R & D expected to profit by solidifying its relationships with many of the former Atco customers by providing quality service and prompt deliveries of R & D chemicals. In fact, Proctor testified that, when all was said and done, R & D secured 15 to 20 good customers. We unequivocally find that this competitive advantage and expectancy of profit constituted goodwill. [43]
Facing the question of valuation, respondent relied on the so-called residual or gap method to determine the total value of the intangible assets. [44] In the past, we have accepted this method of valuing intangibles. *437 See Philadelphia Steel and Iron Corp. v. Commissioner, supra; Copperhead Coal Company v. Commissioner, supra.Respondent calculated the value of the equipment by using the resale price R & D received upon selling four of the subject spray washers ($ 300 per unit). We consider the resale price to be some indication of value even though he resale occurred 6 months after the original purchase. On brief, R & D argued that the $ 300-per-unit resale price was set artificially low as an inducement to the purchaser, a potential customer. Upon review of Proctor's and Kreitner's testimony, we are not convinced that such was the case. Atco's equipment was in ill repair ad therefore had a depreciated value. Many of the machines were rebuilt by R & D because they were inoperable or inefficient. Respondent's determination reflects this state of affairs. The witnesses who testified to corroborate R & D's allocation directed their attention to the cost of purchasing new equipment (approximately $ 2,000 for a new high-pressure spray washer) or *438 to the cost of purchasing component parts and assembling such equipment (approximately $ 1,200 to $ 1,400 for a new high-pressure spray washer). While this information might be relevant, it has minimal probative weight in determining the value of the subject used equipment. R & D has failed to prove the impropriety of respondent's equipment valuation and, therefore, we sustain respondent on this question. R & D allocated $ 7,000 of the purchase price to parts inventory. Respondent determined that no portion of the purchase price should be allocated to parts inventory. Proctor testified that R & D acquired "a few parts." These words alone cast doubt on this $ 7,000 figure. Moreover, R & D failed to satisfy its burden of proof because it offered absolutely no evidence of the value of the few parts. Accordingly, we sustain respondent's position. The final question is whether respondent properly allocated the "residual" or gap" value to the intangible assets, including goodwill and the covenant not to compete. Respondent admits that he may have erred in allocating any of the purchase price to the covenant not to compete because it was "not negotiated as a separate item." However, *439 respondent concedes that he is constrained from asserting an additional deficiency at this late date. [45] See sections 6212(c), 6214(a). Accordingly, we sustain respondent's original allocation of $ 12,000 to the covenant not to compete. Based on the foregoing findings and concessions, we hold that respondent's reallocation of the lump-sum purchase price is proper. Issue 11. Negligence Penalty
The final issue for decision is whether any of the petitioners' underpayments of tax were due to negligence or intentional disregard of rules and regulations.Section 6653(a). Failure to keep adequate books and records necessary to "form a rational basis for the income reported and the expenses deducted" is a proper ground for application of the negligence penalty. Potito v. Commissioner, 534 F.2d 49, 53 (5th Cir. 1976), affd. a Memorandum Opinion of this Court. The petitioners have the burden of proof with respect to this issue. Estate of Mason v. Commissioner, 64 T.C. 651, 663 (1975), affd. *440 566 F.2d 2 (6th Cir. 1977). Respondent contends that all the petitioners failed to keep adequate books and records to establish the proper amount of income and deductions and therefore were negligent. Petitioners basically contend that the negligence penalty should not be applied herein because the adjustments determined by respondent (1) involved issues legitimately contested by petitioners or (2) were caused by petitioners' "lack of understanding of the tax law, honest mistakes or mere inadvertance." Based on their examination of the entire record, petitioners insist that the negligence penalty should not be sustained. At the outset, we note that the petitioners' position is weakened by our observation that Proctor's and Bowie's testimony were not altogether forthright and credible. In addition, during each of the years in issue, the Proctors failed to keep adequate records of charitable contributions (Issue 2) and failed to maintain records needed to explain the nature and source of bank deposits (Issue 1). For each of the years in issue, Chattanooga Products failed to maintain adequate records relating to business use (as opposed to the Proctors' personal use) of its automobiles *441 (Issue 6). Furthermore, with respect to each year in issue, both Chattanooga Products and R & D recognized on brief that responses due to a lack of proper recordkeeping as required by section 274(d) and the regulations promulgated thereunder. [46] Based on the foregoing, we hold that the petitioners have not established that respondent's determination of negligence is erroneous. Therefore, we hold for respondent. Despite our finding of negligence, Chattanooga Products claims that it would be inappropriate and grossly unfair to apply the negligence penalty to the accumulated earnings tax, a penalty tax of its own.Section 6653 provides in pertinent part as follows: SEC. 6653. *442 FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (c) Definition of Underpayment.--For purposes of this section, the term "underpayment" means-- (1) Income, estate, gift, and certain excise taxes.--In the case of a tax to which section 6211 (relating to income, estate, gift, and certain excise taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *. Section 6211(a) defines the term "deficiency" as follows: SEC. 6211. DEFINITION OF A DEFICIENCY. (a) In General.--For purposes of this title in the case of income, *443 estate, and gift taxes imposed by subtitles A and B and excise taxes imposed by chapters 41, 42, 43, 44, and 45 the term "deficiency" means the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, 44, or 45 exceeds the excess of-- (1) the sum of (A) the amount shown as the tax by the taxpayer upon this return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus (B) the amounts previously assessed (or collected without assessment) as a deficiency over-- (2) the amount of rebates, as defined in subsection (b)(2), made. In sum, section 6653(c)(1) defines the term "underpayment" to mean a deficiency under section 6211. A section 6211 deficiency includes taxes imposed by subtitle A of the Internal Revenue Code. Subtitle A encompasses sections 1 to 1564 and necessarily includes the accumulated earnings tax provisions. While we are cognizant of the fact thast the accumulated earnings tax is not a self-assessing tax, we also are aware of the interrorem effect of the negligence penalty; namely, the penalty shall be applied to the total underpayment even though the commission of negligence applied only to a portion *444 thereof. Since we find that the negligence penalty should be applied in the instant case for reasons other than the imposition of the accumulated earnings tax, we need not now decide whether the imposition of only the latter tax would trigger a negligence penalty. The result of our holding, though, is to apply the negligence penalty to the full underpayment of tax, including the accumulated earnings tax. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Chattanooga Products Co., Inc., docket No. 11064-78, and R & D Products Corporation, docket No. 11065-78.↩
2. A portion of the deficiency asserted against the Proctors for the taxable year ended Dec. 31, 1976 is due to adjustments determined by respondent with respect to the Apr. 30, 1976 fiscal year of Chattanooga Products Co., Inc. Because the corporation was an electing small business corporation (subchapter S), respondent's adjustments to the corporate return for that year flow through to the shareholders, the Proctors.
3. The petitioners failed to offer any evidence at trial with respect to several issues raised in their petition. Since petitioners have the burden of proof with respect to these issues, these issues are deemed adandoned and conceded. Rule 149(b), Tax Court Rules of Practice and Procedure.↩
4. The number of daily deposits made to the subject bank accounts totalled 34 in 1972, 34 in 1973 and 54 in 1976. Of these deposits, Proctor was unable to identify the sources and/or nature of the following deposits: Portion of
Gross Income from
Date of
Amount of
Deposit
Unidentified
Account
Deposit
Deposit
Identified
Deposits
1972
American National
Bank
#0104-07006-5
9/05/72
$ 1,600.00
Cash ** The source of this deposit was identified to be David Berry but the nature of the payment was not disclosed.
* $ 1,600.00
11/01/72
1,200.00
* 1,200.00
American National
Bank
#005-914-7
1/05/72
3,150.00
* 3,150.00
1/21/72
2,000.00
* 2,000.00
6/05/72
3,388.00
$ 1,750.00
1,638.00
Unidentified
Deposits (5
deposits)
$ 9,588.00
1973
American National
Bank
#005-914-7
1/05/73
$ 2,807.53
$ 1,603.28
* $ 1,204.25
3/12/73
1,540.00
1,540.00
3/20/73
865.82
250.00
615.82
4/09/73
1,000.00
* 1,000.00
5/04/73
5,389.10
2,082.50
3,306.60
7/12/73
2,738.57
* 2,738.57
9/10/73
1,236.32
727.50
* 508.82
9/21/73
1,000.00
* 1,000.00
9/24/73
3,600.00
* 3,600.00
10/04/73
1,115.00
250.00
* 865.00
10/09/73
700.00
* 700.00
10/17/73
766.50
* 766.50
11/05/73
4,200.70
2,082.50
1,118.20
11/15/73
1,034.00
* 1,034.00
12/13/73
500.00
* 500.00
12/17/73
4,458.17
* 4,458.17
12/28/73
4,741.52
4,741.52
Unidentified
Deposits (17
deposits)
$ 29,697.45
1976
United Bank
#3-249-2
1/05/76
$ 8,158.96
$ 6,358.96
* $ 1,800.00
1/23/73
8,000.00
3,000.00 ** 5,000.00
3/08/76
5,000.00
* 5,000.00
5/19/76
5,000.00
* 5,000.00
United Bank
#47-698-6
8/23/76
2,700.00
2,700.00
Unidentified
Deposits (5
deposits)
$ 19,500.00
At trial, Proctor attempted to identify the sources of a portion of the March 20, 1973 and May 4, 1973 deposits by introducing into evidence certain checks deposited by Proctor on those dates. However, his attempt falls short of the mark because no evidence was presented concerning whether the amounts of these checks were reported as income or whether such checks were received from nontaxable sources. We therefore consider these two deposits to be unexplained.
*. Information not included in the trial record.↩
5. The record contains certain minutes of Chattanooga Products purporting to evidence meetings by its shareholders and board of directors during the period from January 1972 through November 1973. Petitioners have stipulated that the minutes were prepared sometime after September 1974, the month when respondent's agent first proposed an accumulated earnings tax adjustment to Proctor as president of Chattanooga Products. Proctor also testified that contemporaneous corporate minutes were never prepared by Chattanooga Products. Based on this testimony and the particular circumstances under which these minutes were prepared, we give no weight to the statements contained in the minutes. In addition, the record contains certain documents purporting to evidence a proposed plan of Chattanooga Products to construct a new plant and warehouse. Petitioners have stipulated that these documents were prepared in November 1974 and backdated to November 6, 1973. Further, it appears that petitioners do not rely on these documents in presenting their arguments on brief. We certainly should not give these documents any greater deference than that given by petitioners. Therefore, we give no weight to the statements contained in these documents.↩
6. We based our determination on Chattanooga Products' failure to include in its section 534(c) statement facts sufficient to show the basis for the grounds relied on therein as required by section 1.534-2(d)(1), Income Tax Regs. The amounts of Chattanooga Products' alleged reasonable business needs as set forth in its section 534(c) statement may be summarized as follows: Fiscal Year Ended: Ground
4/30/72
4/30/73
4/30/74
(1) Plant and Equipment
Expansion
$ 165,000
$ 159,000
$ 140,000
(2) Working Capital
129,100
134,900
139,500
(3) Expansion of Other
Business
240,000
20,000
(4) To Provide Financial
Strength
56,700
57,000
65,700
Regarding its plant and equipment expansion, the statement revealed the fact that Chattanooga Products investigated the possibility of expanding its plant and equipment in late 1973. Further, the statement indicated that $ 165,000 had been spent on plant and equipment expansion as of the statement date, August 28, 1978. However, the statement did not state any facts showing how much Chattanooga Products anticipated spending or actually spent for plant and equipment expansion in the years under consideration. Moreover, it is apparent to us that any thoughts of expansion in fiscal years ended April 30, 1972 and April 30, 1973 were just that--thoughts. The statement fails to provide sufficient facts to support any alleged expansion plans in those two years. These deficiencies or ambiguities in the statement are fatal to Chattanooga Products' quest to shift the burden of proof with respect to this ground. See Dixie, Inc. v. Commissioner, 31 T.C. 415, 428-429 (1958), affd. 277 F.2d 526 (2d Cir. 1960), cert. denied 364 U.S. 827 (1960). Chattanooga Products asserted in the statement that it needed to accumulate additional working capital to meet its growth requirements (second ground). However, there were no facts (e.g., Financial data or other corporate records) to support the amounts of Chattanooga Products' estimated minimum working capital needs. Further, Chattanooga Products' claim to have entered the real estate rental business (third ground) is in no way supported by the facts contained in the statement. Although Chattanooga Products alleged that it received rental income during the years under consideration (without specifying the amounts), that fact, in and of itself, does not support the contention that Chattanooga Products was in the real estate rental business. It is equally possible that rental income was generated by a passive investment. See Atlantic Commerce & shipping Co., Inc. v. Commissioner, 500 F.2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Wellman Operating Corporation v. Commissioner, 33 T.C. 162, 184-185 (1959). Accordingly, we find that there were insufficient facts in the statement to warrant a shifting of the burden of proof to respondent with respect to the second and third grounds. With respect to the final ground, it appears to us that Chattanooga Products was in search of a "cushion." Its argument is couched in terms of a need to convince customers of its financial strength and the need to provide for inflation. Such a ground is too broad in scope and nebulous in nature to constitute a ground sufficient to place the burden of proof on respondent. See I.A. Dress Co., Inc. v. Commissioner, 32 T.C. 93, 100 (1959), affd. 273 F.2d 543 (2d Cir. 1960), cert. denied 362 U.S. 976 (1960). Chattanooga Products relied on the Fifth Circuit's opinion in Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348 (5th Cir. 1977), revg. a Memorandum Opinion of this Court, to support the sufficiency of its statement.However, that case is factually distinguishable from the instant case. In that case, the taxpayer filed a lengthy statement which included corporate minutes and a summary of the financial statements relied on therein; in the instant case, such supportive facts are conspicuously absent.
7. In fact, Proctor testified that he spent cash for personal expenses rather than writing checks. Proctor's habit of paying his expenses with cash would further limit the cash available for deposit.
*. It appears that both petitioner and respondent used a 15 cent factor in their computations of the cost attributable to personal use. Neither party contested its reasonableness.Based on this apparent agreement and the fact that such factor appears reasonable, we have incorporated it in our computation. See also Rev. Proc. 74-23, 1974-2 C.B. 476↩.
8. See also Suttle v. Commissioner, 625 F.2d 1127 (4th Cir. 1980), affg. a Memorandum Opinion of this Court; Zager v. v. Commissioner, 72 T.C. 1009 (1979), affd. sub nom. Martin v. Commissioner,     F. 2d     (5th Cir. July 6, 1981, 48 AFTR 2d 81-5537, 81-2 USTC par. 9534); JosephLupowitz Sons, Inc. v. Commissioner, 497 F.2d 862↩ (3d Cir. 1974).
9. See Sealy v. Commissioner, T.C. Memo. 1980-7, and Bongiovanni v. Commissioner, T.C. Memo. 1976-131↩, where this Court has held that payments made by a closely-held corporation for the benefit of its shareholders' relatives are constructive dividends realized by those shareholders.
10. On brief, the Proctor's summarized respondent's calculations as follows: ↩
Disallowance of
Corporation's Deduction
Personal use (miles)
Proctor
8,944
Mrs. Proctor
15,000
Total personal mileage
23,944
Estimated cost per mile
$ .15
$ 3,591.60
Constructive
Dividend to Proctor
Annual fair rental value
$ 3,000.00
($ 250/mo. X 12 mos.)
Estimated percentage of
personal use
Proctor      25%
Mrs. Proctor 100%
125%
125%
$ 3,750.00
Total personal mileage
23,944
Estimated operating expenses
per mile
.05
$ 1,197.00
Total Constructive Dividend
$ 4,947.00
11. See n. 10↩
12. Whipple Chrysler-Plymouth v. Commissioner, T.C. Memo. 1972-55↩ and the cases cited therein.
13. Disallowance of Deductions
↩
Personal Use (miles)
Proctor
6,500
Mrs. Proctor
7,500
Total personal mileage
14,000
Estimated cost per mile
* $ .15
$ 2,100.00
14. Calculation of Constructive Dividend
↩
Proctor
Mrs. Proctor
a. Annual Fair Rental Value
$ 3,000.00
$ 3,000.00
($ 250 X 12 months)
b. Percentage of Personal Use
14.44%
50%
(6,500 mi../. 45,000 mi.)
(7,500 mi../. 15,000)
c. Fair Rental Value of Personal Use
$ 433.20
$ 1,500.00
(a X b)
d. Operating Expenses - Personal Use
$ 325.00
$ 375.00
($ .05 per mile)
(.05 X 6,500 mi.)
(.05 X 7,500 mi.)
e. Constructive Dividend (c + d)
$ 758.20
$ 1,875.00
TOTAL
$ 2,633.20
15. The Proctors' 1974 tax year is not in issue.↩
16. Petitioner's claimed relationships of costs and sales are inaccurate. The findings of fact show that the proper relationship between Mrs. Cressman's labor cost and sales of the deodorant product were $ 6,000 to $ 12,000 (year ended April 30, 1973) and $ 6,700 to $ 8,400 (year ended April 30, 1974), respectively.↩
17. These factors have been examined and used by this Court in numerous decisions. See, e.g., Cromer v. Commissioner, T.C. Memo. 1980-263; Shotmeyer v. Commissioner, T.C. 1980-238; Schanchrist Foods, Inc. v. Commissioner, T.C. Memo. 1977-129↩.
*. Information not included in the trial record.↩
18. In fact, this may be the only basis for determining reasonable compensation under the circumstances for we have only gross sales and salary payment figures before us. ↩
19. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119↩ (6th Cir. 1949), revg. a Memorandum Opinion of this Court, implies that such a ratio is reasonable based on that court's suggestion that we consider: (1) a comparison of salaries paid to gross income and net income and (2) a comparison of the salarly policy of the taxpayer/corporation.
20. On brief, respondent contended that a portion of the payments to Mrs. Cressman in Chattanooga Products' fiscal year ended April 30, 1972 was unreasonable compensation and not deductible by Chattanooga Products. Such claimed disallowance for the 1972 tax year was not included by respondent in his notice of deficiency or in his pleadings and was not asserted at trial. Therefore, we lack jurisdiction with respect to respondent's attempted increase of deficiency herein. Sections 6212(c) and 6214(a).
21. Although we lacked jurisdiction to disallow Chattanooga Products' deduction of unreasonable compensation to Mrs. Cressman in fiscal year ended April 30, 1972, for purposes of determining the constructive dividend to the Proctors in 1972, we find that reasonable compensation in that year amounted to $ 1,279.20 ($ 9,840 X 13%). Therefore, the constructive dividend equals the difference between the amount paid to Mrs. Cressman ($ 4,000) and the amount of reasonable compensation ($ 1,279.20) or $ 2,720.80. In addition, if the Proctors' 1974 tax year was in issue, they would have been required to include in their income a constructive dividend equal to $ 5,608 ($ 6,700 of total payments less $ 1,092 of reasonable compensation). See text accompanying n. 42, infra↩.
22. See United States v. Donruss Co., 393 U.S. 297, 303-307↩ (1969), for a brief summary of the legislative history surrounding the accumulated earnings tax. See also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.01 (4th Ed. 1979).
23. Sec. 531 provides: SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.
In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of-- (1) 27 1/2 percent of the accumulated taxable income not in excess of $ 100,000 plus (2) 38 1/2 percent of the accumulated taxable income in excess of $ 100,000. ↩
24. Sec. 535 provides, in pertinent part, as follows: SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition.--For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)). (b) Adjustments to Taxable Income.--For purposes of subsection (a), taxable, income shall be adjusted as follows: (1) Taxes.--There shall be allowed as a deduction Federal income and excess profits taxes and income, war profits, and excess profits taxes of foreign countries and possessions of the United States (to the extent not allowable as a deduction under section 275(a)(4)), accrued during the taxable year or deemed to be paid by a domestic corporation under section 902(a) or 960(a)(1) for the taxable year, but not including the accumulated earnings tax imposed by section 531, the personal holding company tax imposed by section 541, or the taxes imposed by corresponding sections of a prior income tax law.
(c) Accumulated Earnings Credit.-- (1) General Rule.--For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subection (b) (6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561↩) for such year.
25. This figure is the difference between current assets and current liabilities for that year as set forth in the findings of fact ($ 251,978.75 less $ 63,745.47). ↩
26. Union Offset v. Commissioner, T.C. Memo. 1977-47. See Rafferty v. Commissioner, 452 F.2d 767, 772 (1st Cir. 1971), affg. 55 T.C. 490 (1970), cert. denied 408 U.S. 922↩ (1972).
27. See, e.g., Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348 (5th Cir. 1977), revg. a Memorandum Opinion of this Court; Henry Van Hummell, Inc. v. Commissioner, 364 F.2d 746 (10th Cir. 1966), affg. a Memorandum Opinion of this Court, cert. denied 386 U.S. 956 (1967); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 332 (1968); and John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469↩ (1965).
28. See, e.g., Atlantic Commerce & Shipping Co., Inc. v. Commissioner, 500 F.2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Estate of Lucas v. Commissioner, 71 T.C. 838, 852-854 (1979); Elliott v. Commissioner, 32 T.C. 283, 288-291 (1959); Rafferty v. Commissioner, 55 T.C. 490, 499 (1970), affd. 452 F.2d 767 (1st Cir. 1971), cert. denied 408 U.S. 922 (1922); Whitney Chain & Mfg. Co. v. Commissioner, 3 T.C. 1109, 1119 (1944), affd. 149 F.2d 936 (2d Cir. 1945); Fackler v. Commissioner, 45 B.T.A. 708 (1941), affd. 133 F.2d 509 (6th Cir. 1943); Union Offset v. Commissioner, T.C. Memo. 1977-47↩.
29. This figure is equal to the difference between current assets ($ 206,593.94) and current liabilities (123,163.92) as set forth in the findings of fact.↩
30. This figure is the difference between current assets and current liabilities for that year as set forth in the findings of fact ($ 279,871.21 less $ 131,905.28).↩
31. The operating cycle has been described as "the time needed to convert cash into raw materials, raw materials into finished goods, inventory into sales and accounts receivable, and any accounts receivable into cash." Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.03, p. 8-19 (4th ed. 1979). 32. Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200↩. 33. For an extensive discussion of the Bardahl↩ formula and its various components, see Lewis, "Accumulated Earnings Tax," B.N.A. Tax Mgmt. Memo. No. 35-5th pp. A-37 to A-41 (1976). 34. See also Suwannee Lumber Manufacturing Co. v. Commissioner, T.C. Memo. 1979-477; Cunningham, "More Than You Ever Wanted to Know About the Accumulated Earnings Tax," 6 J. Corp. Tax 187, 209-211 (1979)↩.
35. We are certain that the taxpayer would not have advocated such a position had the conceded adjustments resulted in a reduction of its operating cycle. To the extent that the financial statement figures can reasonably be relied upon, they should form the basis for the Bardahl↩ calculation.
36. See W.L. Mead, Inc. v. Commissioner, T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977) (accounts receivable from shareholders, officers and employees included in Bardahl↩ calculation because "such accounts do drain working capital from a business and may be a legitimate business activity").
37. See Empire Steel Castings, Inc. v. Commissioner, T.C. Memo. 1974-34; Bardahl Manufacturing Corp. v. Commissioner, supra↩.
38. Suwannee Lumber Manufacturing Co. v. Commissioner, supra; Empire Steel Castings, Inc. v. Commissioner, supra↩ ("Since petitioner was required to pay estimated taxes during each of the years in issue, this item is an operating expense which should be appropriately reflected in the equation used to determine the monetary amount needed to fund operations for one business cycle").
39. Chattanooga Products' independent certified public accountant prepared the schedule of reasonable business needs for the corporation. From the record, it is impossible to discern whether these alleged needs were actually anticipated by Proctor or were needs which their CPA believed should have been anticipated and planned.↩
40. While we recognize that a going concern necessarily must replace plant and equipment, the accumulated earnings tax regulations require some evidence of specific plans. Although we do not want to be inflexible on this matter, we are left with no choice in the instant case because Proctor did not testify with any specificity about his intentions. Cf. Smoot Sand & Gravel Corporation v. Commissioner, 241 F.2d 197, 202 (4th Cir. 1957), revg. a Memorandum Opinion of this Court, cert. denied 354 U.S. 922↩ (1957) (plans may be inferred from credible testimony of claimed intentions coupled with proof of contemperaneous conduct directed toward carrying out such intentions).
41. While he insists that he did not understand the tax implications of the subchapter S election during the tax years in issue, Proctor confesses to such knowledge sometime after the subject years.↩
42. Although respondent did not assert that the Proctors received constructive dividends in 1974 because that year was not in issue with respect to the Proctors, we are not barred from finding that the disallowed expenses were prorata dividends constructively received by each of the Proctors for purposes of the AET calculation and that Chattanooga Products was entitled to a dividends paid deduction equal to the amount of such dividends. See, e.g., Sebago Lumber Co. v. Commissioner, 26 T.C. 1070, 1074 (1956); Wilson v. Commissioner, 10 T.C. 251, 260 (1948), affd. sub nom. Wilson Bros. & Co. v. Commissioner, 170 F.2d 423 (9th Cir. 1948), cert. denied 336 U.S. 909 (1949); Deviney Construction Co., Inc. v. Commissioner, T.C. Memo. 1977-92↩. See n. 21 for the calculation of the amount.
43. In H & R Distributing Co., Inc. v. Commissioner, T.C. Memo. 1972-203↩, we were faced with facts remarkably similar to those in the case at bar and found that the taxpayer acquired intangible assets.
44. Under the gap method, the value of the intangible assets equals the difference between the total purchase price and the value of the tangible assets.↩
45. The allocation of a part of the purchase price to the covenant not to compete benefits R & D since the cost of the covenant may be amortized over a 4-year period. Sec. 1.167(a)-3, Income Tax Regs.↩
46. At trial, Chattanooga Products and R & D conceded the propriety of respondent's determination with respect to the nondeductibility of such claimed expenses for each of the years in issue. We also wish to emphasize the fact that the petitioners conceded or did not contest numerous other adjustments determined by respondent, the nature and type of which give rise to an inference of negligence (e.g., failure to accurately reflect gross receipts, the attempted deduction of traffic fines and capital expenditures).↩